### CLAMITZ v. THATCHER MFG. CO. et al.
### No. 50, Docket 20309.

Circuit Court of Appeals, Second Circuit.

Jan. 8, 1947.

Meyer Abrams, of Chicago, Ill.; and Joseph Nemerov, and Maurice J. Dix, both of New York City (Shulman, Shulman and Abrams, of Chicago, Ill., of counsel), for plaintiff-appellant.

Beekman & Bogue, of New York City, and Mandeville, Buck, Teeter & Harpending, of Elmira, N. Y. (Edward K. Hanlon, of New York City, and A. H. Harpending, of Elmira, N. Y., of counsel), for appellees.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The appeal is by the plaintiff from a judgment dismissing the complaint on the merits in a derivative suit brought in 1945 by a stockholder against officers and directors of the Thatcher Manufacturing Company, a corporation organized under the laws of New York. Jurisdiction is based on diversity, the plaintiff being a resident of Illinois and the individual defendants all being residents of New York. Although the action originally was broader in scope, the present appeal raises only issues concerning the liability of the individual defendants for fraud and waste in granting options to purchase common stock in the corporation to five persons under circumstances about to be stated.

The corporation, which will now for convenience be called Thatcher, was, during the period involved in the suit, and for some years previously had been, a large manufacturer of glass containers with factories in New York and Illinois. In December 1943, when the events principally relied on by the plaintiff began to take place, Thatcher's authorized stock consisted of 150,000 shares of no par preference stock convertible into no par common stock share for share and of 300,000 shares of no par common. There were then 132,-000 shares of the preference stock and 146,836 shares of the common stock issued and outstanding. The appellant's holdings were 75 of the last named shares.

Held in the treasury as a reserve against the possible conversion of the outstanding preference shares were 132,000 of the common together with 18,000 additional common shares held against the possible future conversion of an equal number of treasury-held preference shares should the latter ever be issued.

While Thatcher manufactured and sold containers extensively, its large volume of business had not been very lucrative for some years and its common stock, which was listed on the New York Stock Exchange, had fluctuated from a high of 48⅞ to a low of 33⅞ in 1936; from a high of 9¼ to a low of 5 in 1942; and in 1943 it went from a low of 6¼ to a high of 14. From 1935 to 1940 dividends had been paid upon it but none thereafter. A large part of its business was in milk bottles which were made to special order for purchasers and fibre containers were a competitive threat.

That there was cause for apprehension on the part of the management of Thatcher concerning the future of the corporation when a special meeting of the directors was called for December 15, 1943 is fairly evident. There were then eight directors of which four were elected by the preference shareholders and four by the common shareholders.[1] Of these, three elected by the preference shareholders, viz., Landon, Swan and Mandeville, and three elected by the common shareholders, viz., Turner, Ackerman and Dugan, were present. They had all been directors for several years, some had been for many years, and it may be taken for granted that they were well informed regarding the affairs of the corporation.

At this meeting appellee Pollock appeared and presented a program whose adoption and the steps taken to carry it out led up to this litigation. Pollock was well known to the directors. He had formerly been a vice-president of a corporation which had on December 31, 1942, become a wholly owned subsidiary of Thatcher. He had been engaged in business similar to that of Thatcher for about twenty-eight years and had been Thatcher's New York Sales Manager since January 1, 1942, under a five-year contract at a salary of $25,000 a year plus commissions and had received under his contract $52,000 in 1942. In 1943 he received $75,740 under it.

At the above mentioned meeting Pollock told the directors in substance that he believed in the future of the corporation and that he and his associates, who do not otherwise have anything to do with this suit, had bought some 35,000 common shares of which he held 7,668 shares and which he called the working control. He produced the sales slips to confirm his statement and told the directors that regardless of what was done at the meeting he and his group intended to increase their stock holdings. He explained what his ideas were as to changes in management and business practices necessary to solve the corporation's problems. These in brief were to put him in charge of its affairs as president with authority to make changes in so-called key personnel as he then outlined, including provision for giving incentives through a stock option plan to certain key men who were to be retained or hired from outside. This was agreed to by the directors. The then president, Ackerman, resigned. Pollock was elected president and Ackerman chairman of the board of directors. One of the directors suggested that Pollock's existing contract be cancelled and it was voted to request the resignation of all officers, other than Ackerman and Pollock, to be accepted at the pleasure of the board.

Thereafter Pollock as president proceeded along the plan he had outlined to the directors and at the next regular monthly meeting of the board on December 22, 1943, the following occurred when the same above mentioned directors and Pollock were present. Ackerman resigned as chairman of the board and left the meeting. Pollock offered to cancel his contract as sales manager and to accept a salary of $50,000 a year for five years as president plus options to purchase 5,000 shares of common stock at $10 a share on or be-

---

[1] The common shareholders could elect five directors but there was a vacancy which remained unfilled until the directors' meeting held January 19, 1944.

fore February 1, 1944; 5,000 shares at $15 and 5,000 shares at $20 on or before January 1, 1949. This offer was accepted. He then explained what changes he proposed to make in so-called key personnel and what stock options he desired to have granted to such men as he wished to retain or hire from outside. These options were voted, Pollock and Dugan abstaining from voting, but of them we are now concerned with only those to Rodewald, a new man and to Dusterdieck, Powers and Dugan, all retained men and the latter a director. Rodewald was to be Vice-President and Assistant to the President, Dusterdieck Vice-President in charge of sales, Powers Secretary and Treasurer, and Dugan Vice-President in charge of manufacturing. Of these Dusterdieck and Powers were voted options on 500 common shares at $10; 500 at $15; and 500 at $20 while Rodewald and Dugan were voted 1500 at $10; 2000 at $15; and 1500 at $20; all to be exercised on or before the dates in the options to Pollock, and all optionees were to be allowed to borrow from the corporation on the security of the stock up to eighty per cent of the amounts needed to exercise their options, such borrowings to be repaid in eight equal annual installments bearing 6% interest.

The market price of the common shares on December 22, 1943 was 13¾ and its average over that year was about $10. Its fair value as of that date was determined by the directors on the basis of its average market price for the year and the option price set at that value.

At this meeting it was decided to grant stock purchase options to other executives and employees, some to be thereafter determined and this proposed program became generally known to the employees.

When the above action was taken, the fact that there was not available in the treasury sufficient stock to permit the exercise of all the options was overlooked. Pollock had mistakenly included in his statement as to options to key executives made at the meeting of December 15, that, "There are 39,260 shares available which would leave 8,260 shares to be used as an incentive for other men or new men as

taken on" and this was apparently accepted as so. But by the time the regular monthly meeting of the directors was held on January 19, 1944, it had been realized that more common stock was needed to carry out the program and at that meeting it was voted to postpone carrying out the incentive option plan to permit the stockholders of the corporation to vote on a proposal to reclassify the 18,000 shares of unissued preference stock into common stock. This would provide 18,000 additional shares of common and by releasing the 18,000 common shares then held in reserve would make available in all 36,000 additional common shares.

The annual meeting of the stockholders was held, after due call, at Elmira, N. Y., on March 2, 1944. The reclassification was voted and the certificate of reclassification required by the law of New York was filed on March 6, 1944. The notice of this meeting was sent to stockholders together with a proxy statement and a letter from the president. The stockholders were thereby informed, inter alia, that:

"The Company in 1941 contracted with Mr. Pollock for his services for a term of five years, under which his compensation is partly determined by a percentage on general line sales. On election as President Mr. Pollock has offered to terminate that contract for a new five year service contract at a fixed salary of $50,000.00 each year thereof and the granting to him of an option to purchase 5,000 shares of Common Stock at $10.00 per share on or before April 1, 1944, 5,000 shares of Common Stock at $15.00 per share and 5,000 shares of Common Stock at $20.00 per share to be exercised on or before January 1, 1949. The market price of common stock on December 31, 1943, the date when such employment contract would become effective if approved was $13.00 per share." Also,

"At its meeting on December 22, 1943, the Board of Directors of the Company determined that it was advisable that opportunity be afforded officers and employees directly responsible for the successful operation of the Company's business to acquire substantial stock owner-

ship in the Company. In order to make available shares of Common Stock for such purposes the proper officers were authorized and directed to cause to be presented for consideration at the next annual meeting of the stockholders appropriate resolutions for the reclassifying of the presently authorized but unissued 18,000 shares of Convertible Preference Stock into 18,000 shares of Common Stock and thus also to make available 18,000 shares of Common Stock now reserved against conversion of an equivalent amount of Convertible Preference Shares. Subject to approval by a vote of not less than two thirds of each class of shares and to completion of listing and registration thereof, the effect of the adoption of the resolutions following would be to make available 36,000 shares of Common Stock as to which it is contemplated that the Board of Directors may, from time to time, and without further authorization from the stockholders, be issued and sold to such officers and employees as determined by the Directors partly at $10.00 per share and partly at $15.00 and $20.00 per share. The termination dates at each price to be similar to options granted to Mr. Pollock. * * *"

It was stated in addition that the optionees were to have the privilege of borrowing from the corporation as hereinbefore set forth; that the options were intended to be non-assignable and were "to be granted on the condition that purchasers of stock thereunder shall be made for investment only." The stockholders were told that the solicitation of proxies was being made at the expense of the corporation and that Georgeson & Co., of New York had been engaged to aid in that for which a fee of $1000.00 plus out of pocket expenses estimated at $1500.00 would be paid. The president's letter informed stockholders that he, as the largest individual stockholder and chief executive, had given much thought to the development of the potential earning power of the corporation; that he regarded it necessary to have stock available for the proposed options to provide an incentive to those who would receive them to work for the welfare of the corporation and urged stockholders to vote in favor of the proposal.

The appellant was represented at the stockholders meeting by his attorney who had previously, but without success, requested by letter to Thatcher that the meeting be postponed to enable him to communicate with stockholders. He moved for an adjournment of thirty days for the same purpose and insisted that putting 36,000 of the common shares in the hands of the officers would allow them to control the corporation and do so without purchasing it as an investment since 80% of its cost to them was to be loaned by the corporation. The proposed loan, he pointed out, would be unlawful. During the discussion Mandeville, the corporation's general counsel, agreed to that view of the proposed loan and assured appellant's attorney that he would oppose it. The motion to adjourn the meeting for thirty days was then defeated and the reclassification was voted as before stated. Following this meeting appellant's counsel on March 7, 1944, wrote Thatcher that he considered the action taken to be illegal and that though his client appreciated the abandonment of the proposed loan he still objected "to the program whereby are given options to the president to purchase at $10.00 share when the shares at the present market are quoted at $17.00 per share and when Mr. Clamitz paid $47.00 per share." He demanded "proper action to prevent the option agreement from being carried out." At this time there had been no binding agreement regarding the options as the board of directors still had to take action thereon, but the optionees above named and others had agreed to accept positions under the new management in reliance upon the corporation's carrying out the proposal in good faith.

The letter of appellant's counsel was ignored and Pollock sent proposed options embodying the provisions as stated to 17 proposed optionees including those already mentioned, other than himself, with the request that each inform him whether or not he intended to exercise the option. All the optionees replied on or before March 14, 1944 and all expressed their intention to take up the $10 shares. Two replied that they would take their shares at $15; a total of 450 shares. And one indicated

his intention to purchase his allotment— 200 shares—at $20. Pollock, of course, intended to exercise his options.

With this information at hand the directors met on March 22, 1944, all but one, Griffis, being present, and voted to grant the options. Both Pollock and Dugan, the only directors who were to receive options, refrained from voting. The price of the common stock as quoted that day on the New York Stock Exchange was $19 a share.

The options at $10 were exercised by all the optionees but Pollock and without loans from the corporation. Pollock did not take any stock at that price for the following reason.

He had been living in Stamford, Conn., and when he became president had to move to Elmira. He had purchased a house there and to help provide funds to pay for it; to take up a loan; and to pay income taxes in March 1944, he made sales in that month of 2,468 of his Thatcher common shares. As his $10 option had to be exercised within six months after the date of his sales he would, if he took up that option, have been required under § 16(b) of the Securities and Exchange Act of 1934, to account to Thatcher for the profits realized.

At a meeting of the directors on May 15, 1944, when the price of the shares on the exchange was 16¾ it was voted to cancel Pollock's unexercised $10 a share option and to grant him a new option to purchase the same number of shares on or before April 1, 1945 at $15 a share. He accepted and exercised the option on March 31, 1945, when the stock exchange price of the shares was just that.

In all, eighteen optionees have taken under their options 6700 shares at $10; 8500 shares at $15 and 400 shares at $20. All the optionees whose options are attacked in this suit have remained in the employ of Thatcher except Dugan who resigned after about a year under the new management. No question is made as to their ability and value to the corporation.

Having found the facts as above outlined and made other incidental and consistent findings on amply supporting evidence, the trial court found that the options were not granted fraudulently and that there was no waste of the corporation's assets.

■■■ Whether reversible error in so doing has been shown on this appeal depends upon whether as a matter of law the acts of the directors may be so justified. But it does not depend upon a facility in name calling. Of course the directors were fiduciaries who were bound to act at all times fairly and honestly for the best interest of the corporation and could not take advantage of their position as "insiders" for their own personal gain. They had to see to it that the corporation should have the benefit of their best judgment and act solely and always in good faith to promote its welfare. Pollitz v. Wabash R. Co., 207 N.Y. 113, 100 N.E. 721. Incentive compensation must bear a reasonable relation to the value of the services it is made to obtain. Such reasonable relationship is in the first instance an affair of business to be handled in the light of all the relevant circumstances in the exercise of the unbiased judgment of those in charge of the business itself. Pollitz v. Wabash R. R. Co., supra; Moore v. Linahan, 2 Cir., 117 F.2d 140, 144.

■■■ Whether these defendants exercised their own sound judgment collectively as directors in granting the options is a matter of fact to be determined like any other fact from the evidence in the case. The trial judge found, after hearing the witnesses and being in a better position than we are to decide as to their credibility, that they did and were in so doing acting to obtain what in their opinion was best for the corporation. Unless there are facts which make the action of the directors fraudulent as a matter of law, the finding that the granting of the options was not in the perpetration of a fraud upon the corporation should be accepted because not clearly erroneous. Rule 52, F. R. C. P., 28 U.S.C.A. following section 723c; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 433; Cray, McFawn & Co. v. Hegarty, Conroy & Co., 2 Cir., 109 F.2d 443.

■ In respect to the action taken at the meeting on December 15, 1943 there are no facts which show constructive, as distinguished from actual, fraud. It was quite reasonable to believe that the directors were not only not threatened or intimidated by Pollock's position as a comparatively large stockholder or alarmed by what he proposed, but they considered his program for a change in management a sound and welcome one. And if they did, as may be inferred from their conduct, apparently events have proved their judgment sound. They were justified in valuing the common stock as of that date at $10 a share and in so doing complied with the requirements of § 12 of the New York Stock Corporation Law, Consol.Laws, c. 59.

Had the options been granted without the then unexpected delay occasioned by the need to make adequate stock available there could be no fair doubt as to their lawfulness. But as it turned out delay, until March 22, 1944, became necessary before final action could be taken by the directors on the option proposal. Meanwhile the stock of the corporation had risen in price on the exchange until it was quoted at $19, or nearly twice the $10 option price. Though the proposed optionees had been assured that they would be granted options at the prices originally set, the directors had not irrevocably committed the corporation. We shall assume that they could, without subjecting Thatcher to danger of successful suits by the proposed optionees, have refused to grant any options without reflecting in the price the increase in market price since the time the proposal had been made in December. And we shall take it for granted that, all else aside, the granting of options at $10 on stock selling on the exchange for $19 would be so great a spread between price and value that it would amount to constructive fraud upon the corporation. But the facts in this instance belie that. A new management had been installed with competent men in charge who were to be given every reasonable incentive to build up the corporation's earning capacity and it was thought essential to create the desire to co-operate on the part of some so-called key employees. Good morale would not be attained in the organization if those who had been led to expect they would receive options and who might reasonably believe that their willingness to co-operate had in part at least been responsible for the increase in the exchange price of the stock, were put in the position to feel that the corporation's own delay had been used to their disadvantage. Whether to disappoint the just expectations of those on whom the corporation needed to rely during its upbuilding was a business problem for the directors to solve. Having justifiably found that they did it in the manner heretofore stated by honestly exercising their best judgment to promote the welfare of the corporation the trial court rightly dismissed the plaintiff's complaint whose charges of fraud and waste remained to the end the unproved assertions of but one dissatisfied stockholder.

■ Some complaint has been made because the options could be exercised at any time after they were granted, though only while the optionees remained in the employ of the corporation, and that they were not conditioned upon any agreement by the optionees to remain employed for a definite period. Whether or not such a condition would have helped or hurt the incentive features of the arrangement and consequently been good or bad for the corporation was also a business problem for the directors to solve. Having acted honestly in that regard, the result of their best judgment is binding upon the corporation and its stockholders.

Judgment affirmed.