Samuel C. Coleman, J.
Two stockholders of a Wisconsin corporation have brought this action against the corporation and a number of its directors to restrain them from continuing in effect an employee stock ownership plan under- which an option to purchase stock has already been granted to the president of the corporation. The question basically is whether the plan and the grant of option under it by the board of directors is “wasteful” of the corporation’s assets; whether the plan . as applied to the president achieves its purpose 1 ‘ to provide incentive for * * * key employees * * * and to encourage stock ownership by such employees ’ ’. The plan was adopted at a meeting of stockholders by an overwhelming vote, —one of the plaintiffs voting against it and the other not voting.
The corporation was undergoing internal reorganization; one Maclver had been in its employ for many years and was its executive manager. The controlling stockholders wished to retain his services as president and general manager and there were long drawn out negotiations to this end. In November, 1952 an agreement was reached between Maclver and the corporation— an employment contract and the granting of an option to him to purchase stock, subject to approval by the stockholders of the employment agreement, and of an employee stock ownership plan (not the specific grant to Maclver itself but that was included in the terms of the employment agreement). Maclver was already acting as president of the corporation and the proposed agreement was to be effective as of July 1, 1952. Approval by stockholders of the plan in any ease was required as the stock to- be issued under it would come from an increase in the number of authorized shares after amendment of the certificate of incorporation. The notice of the stockholder’s meeting adequately stated the purposes of the meeting *1037 and gave the details of the proposed employment contract, of the employees’ stock ownership plan; and stated the terms of the grant already made to MacIver. It was these proposals that were adopted on May 8,1953, less than 4% of the stockholders voting against them. A formal contract of employment was then entered into on that day relating back to July 1, 1952, in which was incorporated the stock option granted the previous November. The option was for the purchase of 5,000 shares at $9.60 a share; the stock was selling in November for about $10 a share; by May 8,1953 its value had gone to $14.25 a share.
Specifically the plaintiffs’ complaint is that the grant of the option was in the nature of a gift; that Maclver, the very day his contract of employment was entered into, might have exercised the option, resigned his position as president and general manager, selling the stock at a profit of over $20,000. It was in plaintiffs’ opinion a gift, and not an incentive to continued activity in behalf of the corporation, because according to them, there was no obligation on Maclver’s part to remain with the corporation for any period of time. His employment, they say, was entirely at his will, without any assurance, buttressed by legal compulsion, that the corporation could reasonably count on receiving the benefit of his services. If, they concede, Maclver had obligated himself to working so much as a year, they would be in no position to question the judgment of the board of directors in granting him the option. As to the terms of the employment contract generally they accede to the judgment of the board. We turn then to the contract of employment and the option.
By the very first clause of the contract of employment, ‘ ‘ the Company hereby employs Maclver as its General Manager and Maclver hereby agrees to serve the Company as its General Manager from July 1, 1952, through June 30, 1955, subject to the terms and provisions hereinafter set forth.” The salary was $35,000 a year, with provision for a bonus. ‘ ‘ In addition to such minimum salary, Maclver, pursuant to the Key Employees’ Incentive Stock Option Plan * * * has been granted
a stock option under date of November 21, 1952”. Under the option agreement, (clause 3) “ if at any time during the life of Maclver’s employment contract with the Company” he should break that agreement, the option is to terminate except, of course, to the extent that he has already exercised it. These two provisions, it seems to me, dispose of the objections raised by the plaintiffs. Maclver agrees to remain with the company at least three yéars (really a little over two years as nearly one year had gone by when the contract was adopted) and can *1038 obtain the benefit of the option only if he remains in its employ. I say at least three years as the employment contract provides for continued employment in certain circumstances in one capacity or another and on varying terms for an extended period; for example if neither side were to give notice of termination before the end of the three-year period, “ the Company shall continue to employ Maclver and Maclver shall continue to serve the Company subject to the terms and provisions hereof ”. Neither side gave notice. It is quite true, as plaintiffs assert, that Maclver could have done as they say. But quite apart from the long history of Maclver’s association with the company, and the assumed good faith of the contracting parties, is not a promise to serve for three years as general manager and president a commitment which we should recognize? An employee, —no matter what his status, can make no more binding commitment than to promise to remain with his employer; he is certainly not to be put under bonds (cf. Wyles v. Campbell, 77 F. Supp. 343, 348). And of necessity Maclver did remain with the company from November, the date of his promise, to the following May.
But, reply the plaintiffs, the employment is really at will and they refer to clause 11 of the employment contract. “If at any time while this agreement is in effect Maclver shall refuse to serve the Company in accordance with the terms and provisions hereof when physically able to do so, or if Maclver shall accept employment in any capacity with a. competitor of the Company without the written consent of the Company first had and obtained, except as hereinbefore expressly permitted, then this agreement shall terminate forthwith and all of Maclver’s rights hereunder shall terminate ”. This, they say, gives Maclver power to terminate the agreement, in effect as though it had never existed. But this overemphasizes the word “ terminate In one sense any contracting party may “ terminate ” an agreement, bring it to an end, by his own breach; but the power so to “ terminate ” does not retroactively loosen the bonds of the agreement and here Maclver had undertaken to continue with the company for three years. The company could not compel Maclver to continue in its employment and I dismiss the question whether it could enjoin him from working elsewhere, although it is plain that he did recognize and accepted limitation upon his freedom in that respect. Similarly I put aside the question of what other remedies the company may have, for Maclver’s breach — such as would follow in any case of breach of contract. Other provisions indicate that the clause means only that if Maclver does break his promise, at the least certain *1039 consequences to him do follow, and those consequences are significant. I have referred to the fact that he was to receive a bonus — a graduated percentage of net earnings (clause 8).
The bonus was to begin January 1, 1953 and to continue so long as Maclver remained as general manager, which, as I have said, might well be beyond the initial three-year period — even seven years beyond it. But the bonus was not to be paid when earned; it was to be retained by the company and accumulated until Maclver “ shall (1) attain the age of sixty-five (65) years or sooner die [he is now about 60]; or (2) until he is no longer employed as General Manager by the Company, whichever date, (1) or (2) is later ”. Other provisions in the agreement (clauses 3, 4, 5 and 6) tend to obscure the question as to the time when the bonus was payable but hot to the extent of eclipsing the generality and comprehensiveness of the language in clause 8 and in clause 11 as to the consequences of a deliberate breach on Maclver’s part. The provisions of those clauses seem to • relate to the payment of the bonus upon the termination of the agreement in accordance with its terms, not in the event of breach, and at least the company would be on firm ground in refusing to pay any accumulated bonus in case of a breach. After the three-year period, if the original terms were not extended by failure of notice to terminate there were alternative provisions under which Maclver could receive $21,000 a year for 5 years, or $15,000 a year for 10 years, or $12,000 a year for 2 years or even $10,000 a year until his death, depending upon the capacity in which he was to be employed. There were also valuable disability and pension rights — for himself or his widow. These additional potentialities, too, would be lost in the event of a breach. These are the “ rights ” which would ‘1 terminate ’ ’; they in no way affect the relation arising out of an agreement to work for a term of years; in no way suggest that the employment was at Maclver’s will.
Thus far I have considered plaintiffs’ contention on the hypothesis that a subsisting contract of employment with conventional 11 consideration ” is'required before it can be said that an employee is entitled to the benefits of a stock option plan. I find such consideration in the contract of employment with its consequences of a breach by Maclver — his loss of a bonus, with other disabilities including the disability of exercising his option if he should leave his employment. But the very cases upon which the plaintiffs rely for their major premise do not support them. They speak of consideration, to be sure, or suggest consideration in the form of a contract of employment, but they do not require such a contract. “ The validity *1040 of a stock option plan under which selected personnel of a corporation may acquire a stock interest in the corporation depends directly upon the existence of consideration to the corporation and the inclusion in the plan of conditions, or the existence of circumstances which may be expected to insure that the contemplated consideration will in fact pass to the corporation. * * * No rule of thumb can be devised to test the sufficiency of the conditions which are urged as insurance that the corporation will receive the contemplated benefit. The most that can be said is that in each case there must be some element which, within reason, can be expected to lead to the desired end. What that element may be can well differ in each case. * * * We do not think that it is indispensible to bind the optionee by an employment contract but there must be some circumstance which my reasonably be regarded as sufficient to insure that the corporation will receive that which it desires to obtain by granting the options ”. (Kerbs v. California Eastern Airways, 33 Del. Ch. 69, 74, 76, 77.) “ As we view stock option plans,' they are governed by no new or unusual rules, but by the familiar principles of contract. There must be a consideration for the granting of an option. * * * Valid consideration for a contract of this character may be present in any of various forms ” (Gottlieb v. Heyden Chem. Cory., 33 Del. Ch. 82, 89, 90, decided the same day as the Kerbs case).
By these tests, the probability that Maclver would continue with the company becomes almost a certainty. He had spent his working life with it — over 35 years; had risen in position and responsibility, with increased compensation. He was not a member of either of the groups, family or financial, that controlled the company, but an employee in the strict sense. Death and ill health of two members of the controlling groups were among the factors that called for internal changes. Maclver had had no written contract with the company theretofore but changing conditions called for a change in that respect; and Maclver desired the assurance of a writing. To give full time to the company, he agreed to give up a position of responsibility with an insurance company which had not taken up much of his time, but for which he had received $7,500 a year. His salary as president and general manager was increased but he was assuming full direction and control of the company. He ceased to be a member of the company’s profit-sharing and retirement plan and the maximum amount which he could expect for contributions already made was substantially reduced. The amount of the bonus he would receive would in large part be a reflection of his own efforts; the value of the stock he would purchase under *1041 the option would depend in large measure on the outcome of his efforts as the head of the company. The agreement itself looked ahead to many years of service. I can quite understand Maclver’s state of mind when he testified that if he did commit himself to the company by his contract his ability to make a change thereafter would be seriously limited. ‘ ‘ I had the feeling that I was closing the door, that I was going to stay for the rest of of my life with this company, so long as they wanted me These factors — not Maclver’s statement of his earlier state of mind, to be sure — the circumstances of the past history, the long employment contract, the consequences of Maclver’s breach including the loss of the option, “ may reasonably be regarded as sufficient to insure that the corporation will receive that which it desires to obtain by granting the option that Maclver was going to stay, as indeed he has stayed.
No similar circumstances were present in the two cases relied on by the plaintiffs. In the Kerbs case there were no contracts of employment, some of the director beneficiaries entered the company’s employ believing that they would be given the opportunity to purchase stock, the beneficiaries could exercise their respective options within six months after terminating employment, and they could terminate without suffering any adverse consequence. In the Gottlieb case neither side prevailed on motion for summary judgment, the court believing that testimony of “ attending facts and circumstances ” was necessary. But, in reciting the facts as they already appeared, the court adverted to the circumstance that of seven intended beneficiaries, six had no employment contracts and it had not been shown that the employment contract of the seventh had been disclosed to the stockholders. In the Kerbs case the court summarizes the facts in seven other cases (some outside its jurisdiction) and states the criteria by which option plans had been either upheld or invalidated; in six cases the plans were upheld; in the other there was “ no showing that it was granted either to induce the optionee to enter the company’s employ or to remain in it ” — a factor absent here. “ In each of [the other] cases, there was some element, either in the plan itself or in the surrounding circumstances resonably calculated to keep the optionee in the corporation’s employ” (33 Del. Ch. 69, 76-77). Among the cases referred to is Clamitz v. Thatcher Mfg. Co. (158 F. 2d 687) where one of the grounds of complaint against the granting of options was that they could be exercised at any time after the grant though only while the employees remained in the corporation’s employ, and that they were not conditioned upon any agreement by the employees to remain employed for a *1042 definite period. Yet the Court of Appeals for the Second Circuit thought that 1 ‘ Whether or not such a condition would have helped or hurt the incentive features of the arrangement and consequently been good or bad for the corporation was also a business problem for the directors to solve. Having acted honestly in that regard, the result of their best judgment is binding upon the corporation and its stockholders ” (p. 693). The views of the court in that case, it seems to me, should prevail here and call for a finding in favor of the defendant on the question of the validity of the agreement from the standpoint of contract.
The second ground of attack upon the option is that the purchase price was too low. This, too, really seems to be an attack on the equivalence of consideration — a matter largely of bargaining and of judgment as to matters 1 ‘ imponderable ’ ’ in nature (Clamitz v. Thatcher Mfg. Co., supra; cf. Truncale v. Blumberg, 88 F. Supp. 677, 679; Trúncale v. Scully, 182 F. 2d 1021). The question arises in this manner, some of the facts being repeated: The option was granted November 21, 1952 subject to the approval of the plan by stockholders at the May, 1953 meeting. The proposed plan called for a grant of option at 96% of the market value of a share on the date the option was granted. On November 21, 1952, the market price was $10 a share; on May 8,1953, $14.25 a share. If then, say the plaintiffs, Maclver had exercised his option on that date (he did not and has not yet done so) and had sold the stock he would have realized a profit of $23,250. We do not know to what extent Maclver’s efforts and the assurance of his stay with the company contributed to the increase. The plaintiffs do not suggest that it was fraudulent on the part of the directors to make this profit possible; but they do say that since the employment agreement was approved and the option plan adopted only in May, 1953, the price on an earlier day cannot prevail. But I think they are mistaken. A price had to be fixed and there is no reason why it could not be done retroactively unless there was fraudulent conduct, and that, as I have said, is not contended. Plaintiffs recognize that a stock ownership plan generally, with a fair option price, can be put into effect by directors without specific authorization from stockholders (cf. Diamond v. Davis, 38 N. Y. S. 2d 103, affd. 265 App. Div. 919, affd. 292 N. Y. 552). Here the directors went beyond requirements. They submitted the plan as well as the employment contract to the stockholders. The price fixed was above par value — it could not be less than par -— and below market value, again as it would be, as the stock was to be offered at a special price to certain employees under the option plan. Within those limits and without specific authori-
*1043 zation, the directors would have been free to exercise their judgment. And in this instance pursuant to the plan they fixed the price prevailing at the time they provisionally granted the option and gave full notice to stockholders. It was in November, 1952 that Maclver was assured he would have a contract of employment and a stock option and it was then that the responsibility to improve the financial condition of the company became his. In this respect the case is strikingly similar to the Clamits case already referred to (158 F. 2d 687). There the option was granted in December, 1943 at $10 a share when the stock was selling at $13. Because of necessary delay caused as here by the necessity of increasing the amount of authorized stock so as to have shares available under the employees ’ stock plan, there was no final action by the directors until March, 1944 when the market value of the stock had risen to $19. The Court of Appeals saw no reason to interfere with the findings of the District Judge that the grant of the option notwithstanding the increase in price, was made by the directors acting in the interests of the corporation. The court assumed that the corporation would not be bound to grant the option in 1944 without taking into account the increase in the value of the stock and assumed, too, that a grant of an option at $10 for stock worth $19 would “ all else aside * * * be so great a spread between price and value to amount to constructive fraud upon the corporation. But the facts in this instance belie that. A new management had been installed with competent men in charge who were to be given every reasonable incentive to build up the corporation’s earning capacity and it was thought essential to create the desire to co-operate on the part of some so-called key employees. Good morale would not be attained in the organization if those who . had been led to expect they would receive options and who might reasonably believe that their willingness to co-operate had in part at least been responsible for the increase in the exchange price of the stock, were put in the position to feel that th corporation’s own delay had been used to their disadvantage. Whether to . disappoint the just expectations of those on whom the corporation needed to rely during its upbuilding was a business problem for the directors to solve. Having justifiably found that they did it in the manner heretofore stated by honestly exercising their best judgment to promote the welfare of the corporation the trial court rightly dismissed the plaintiff’s complaint whose charges of fraud and waste remained to the end the unproved , assertions of but one dissatisfied stockholder ” (p. 693).
I have quoted extensively because of the basic similarity of the cases and because I believe a similar result should follow. There *1044 was no fraud; the directors exercised their best judgment and in a legal sense there was no waste.
The provisions of the Internal Revenue Code tend to support the position of the directors. For income tax purposes Maclver’s option was effective in November, 1952 even though subject'to later ratification of the stockholders. “If the grant of an option is subject to approval by stockholders, the date of grant of the option shall be determined as if the option had not been subject to such approval” (Internal Revenue Code, § 130A, subd. [d], par. [5], at the time; now § 421, subd. [d], par. [5]). The defendants seem to think that this provision automatically disposes of the question of equivalence in their favor. I do not think so — the Internal Revenue Code has definitions and contains concepts that may not be generally applicable; but I do agree that the provision indicates the reasonableness of the action of the parties. If, as I have already pointed out, unissued or treasury stock had been available in November, no. subsequent approval of stockholders would have been necessary; the grant would have been effective and could have been exercised immediately. No stock being available the matter had to be deferred; the stockholders in May could have declined to authorize the increase in stock or the option plan, and Maclver would have had nothing. But if the stockholders agreed then the option price for income tax purposes would have been $9.60. The large extent to which business and corporate affairs are conducted by reference to income tax provisions suggests that it was 1 ‘ the just expectations ” of all concerned including the plaintiffs that the option price of $9.60 would prevail and that the vicissitudes of the market — up or down — would have no bearing upon the matter. The almost unanimous acceptance by stockholders of a policy prescribed for income tax purposes as the standard for purposes of deafing between the corporation and its executive officers seems to be a reasonable mode of procedure.
As to the other employees to whom options may be granted in the- future, the question of price cannot come up; there will be no intervening period as to them. No proposed action as to them has been announced and the directors cannot be restrained from taking action. The directors will be aware of their obligation to obtain assurances of the company’s receiving its desiderata and they will take the consequences of their failure to do so.
There will be judgment for the defendants dismissing the first cause of action; the second cause of action was withdrawn on the trial. Let the form of judgment be settled.