PINNACLE CONSULTANTS, LTD., in its own behalf and on behalf of shareholders of Leucadia National Corporation, Plaintiff–Appellant,

v.

LEUCADIA NATIONAL CORPORATION; Ian M. Cumming; Joseph S. Steinberg; Paul M. Dougan; Lawrence D. Glaubinger; Melvin L. Hirsch; James E. Jordan, Jr.; John W. Jordan, II and Jesse Clyde Nichols, III, individually and as Officers and Directors of Leucadia National Corporation, Defendants–Appellees.

No. 163, Docket 96–7089.

United States Court of Appeals, Second Circuit.

Argued Sept. 9, 1996.

Decided Dec. 10, 1996.

Lester J. Tanner, New York City (Sharman T. Propp, Tanner, Propp & Farber, New York City, of counsel), for Plaintiff–Appellant.

Dennis J. Block, New York City (Miranda S. Schiller, Jason M. Halper, Weil, Gotshal & Manges LLP, New York City, Richard Cashman, Pavelic & Levites, New York City, of counsel), for Defendants–Appellees.

Before: FEINBERG, MINER, and PARKER, Circuit Judges.

MINER, Circuit Judge:

Plaintiff-appellant Pinnacle Consultants, Ltd. ("Pinnacle") appeals from a judgment entered in the United States District Court for the Southern District of New York (Sotomayor, J.) dismissing its complaint for failure to state a claim and for lack of subject matter jurisdiction. In its complaint, Pinnacle alleged violations of § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(b)-(d), and also asserted state common law claims for corporate waste, conversion, breach of fiduciary duty, and fraud. In an Opinion and Order entered November 16, 1995, the district court granted defendants-appellees' motion to dismiss the complaint with respect to Pinnacle's federal law claims and certain state law claims.

The district court found that Pinnacle's § 14(a) claim was barred by the statute of limitations, that Pinnacle had failed to plead the predicate acts necessary to support its RICO claim, and that there was no basis for the state law claims of fraud and conversion. The district court reserved judgment on defendants-appellees' motion to dismiss Pinnacle's remaining state law claims until further discovery had taken place concerning Pinnacle's principal place of business. Following the additional discovery, the district court found that Pinnacle's principal place of business was New York and therefore that there was no diversity jurisdiction over the remaining claims. On December 18, 1995, judgment was entered dismissing Pinnacle's complaint in its entirety.

For the reasons that follow, we affirm the judgment of the district court.

## BACKGROUND

Pinnacle is incorporated in Delaware and is wholly owned by Anne–Renee Testa. Pinnacle's sole asset is a minority share of the stock of defendant-appellee Leucadia National Corporation ("Leucadia"), a financial services corporation based in New York. The eight individual defendants were the directors of Leucadia (the "Directors") during all times relevant to this action.

In May of 1994, Pinnacle commenced a shareholder derivative action against the Directors, claiming that they had defrauded Leucadia over a seven-year period by engaging in illegal stock transactions. The allegations in the complaint generally relate to four separate transactions: the issuance of warrants to Leucadia directors Ian M. Cumming and Joseph S. Steinberg in 1985, 1991, and 1992, and the merger of Marks Investing Corporation ("MIC") into Leucadia in 1990.

Cumming has served as a director and as chairman of the board at Leucadia since June of 1978. Steinberg has served as a director of Leucadia since December of 1978, and as president of Leucadia since January of 1979. During Cumming and Steinberg's tenure, Leucadia's financial health improved significantly. In December of 1978, Leucadia's common stock had a book value of negative $.22. On December 31, 1993, the book value of Leucadia's common stock was $32.54, and Leucadia had reported the highest pre-tax income in its history.

Cumming and Steinberg had entered into employment contracts with Leucadia providing that, in addition to base compensation, they were entitled to "[s]uch additional compensation as may from time to time be authorized by the Board of Directors" and that they had the right to participate in "profit sharing, stock option, cash or stock bonus or other plan or arrangement . . . in the sole discretion of the . . . Board of Directors of the Corporation." Leucadia's board of directors had an Employee Benefits Committee (the "Committee"), which reviewed and recommended the compensation of the chairman of the board and the president. The Committee consisted of three outside directors, defendants Jesse Clyde Nichols III, Paul M. Dougan, and James E. Jordan, Jr.

Cumming and Steinberg also were general partners of a New York general partnership, TLC Associates ("TLC"). In 1979, TLC acquired 100 percent of the outstanding stock of Uintah National Corp., which, in turn, owned approximately 51.9 percent of Leuca-

dia's outstanding voting stock. As of May of 1985, four Leucadia directors, Cumming, Steinberg, Lawrence D. Glaubinger, and John W. Jordan II, through investment in TLC, beneficially owned in the aggregate approximately 55 percent of Leucadia's outstanding common stock.

On May 8, 1985, Leucadia's board of directors authorized the issuance of warrants to Cumming and Steinberg, entitling each of them to purchase 200,000 shares of Leucadia common stock at $25 per share (approximately 17 percent above the then market price) (the "1985 Warrants"). Thereafter, a majority of Leucadia's shareholders approved the issuance of the 1985 Warrants. Leucadia's 1985 Proxy Statement disclosed that the 1985 Warrants were issued to Cumming and Steinberg "[i]n recognition of their efforts in establishing record achievements during the past six years." The 1985 Proxy Statement also disclosed that Leucadia's officers and directors as a group beneficially owned 56.5 percent of the outstanding shares of Leucadia common stock.

In January of 1987, as a result of a two-for-one stock split, the 1985 Warrants were exercisable at $12.50 per share for 400,000 shares each by Cumming and Steinberg. In November of 1989, Leucadia bought back from Cumming and Steinberg warrants for an aggregate of 786,000 Leucadia shares at a purchase price equal to the difference between the warrant exercise price ($12.50 per share) and $21.56 (the price that was paid by Leucadia to other shareholders in a self-tender offer executed shortly thereafter, plus an interest factor).

In 1990, Leucadia merged with MIC, a Delaware corporation. Prior to the merger, in May of 1990, MIC's shares were owned by Leucadia (56.08 percent), Cumming (4.39 percent), Steinberg (4.39 percent), Jordan II (15.20 percent), and Carl Marks & Co. and its subsidiary. MIC owned a 54 percent interest in TLC, which, in turn, beneficially owned approximately 58.7 percent of the outstanding common shares of Leucadia. The result of this circular ownership structure was that Leucadia, through its direct interest in MIC and MIC's direct interest in TLC, indirectly owned shares of its own stock.

In order to simplify this circular ownership structure, Leucadia requested that its shareholders approve a merger of MIC into Leucadia at Leucadia's 1990 annual shareholder meeting. An affirmative vote of two-thirds of Leucadia's common shares entitled to vote was required to approve the merger. The 1990 Proxy Statement disclosed that TLC beneficially owned 58.7 percent of the outstanding Leucadia shares, that TLC "intends to cause all of such Leucadia Shares to be voted in favor of the Merger," and that approval of the merger was "assured" if an "additional approximately 8%" of outstanding Leucadia stock voted in favor of the merger.[1] On May 11, 1990, the merger was approved by the shareholders.

In June of 1990, Leucadia's board of directors voted to issue warrants to Cumming and Steinberg, entitling each of them to purchase 400,000 shares of common stock at a price of $22 per share (the "1991 Warrants"). At that time, Leucadia's common stock was selling for $21.88 per share. The 1991 Proxy Statement disclosed that the officers and directors of Leucadia as a group beneficially owned 54.1 percent of the outstanding Leucadia common shares. In May of 1991, a majority of outstanding shares was voted to approve issuance of the 1991 Warrants. In January of 1992, Leucadia bought back the 1991 Warrants from Cumming and Steinberg at a price of $18.375 per share, the difference between the $22 per share exercise price and $40.375, the closing price of common shares on January 9, 1992.

In January of 1992, Leucadia's board of directors once again authorized the issuance of warrants to Cumming and Steinberg, entitling each of them to purchase 400,000 shares of Leucadia common shares at $40.375 per share (the "1992 Warrants"). These warrants were not exercisable or transferable until April 1, 1993. The 1992 Proxy Statement disclosed that Leucadia's directors as a group beneficially owned in the aggregate

---

1. TLC determined how to vote its shares of Leucadia stock through a four-member committee, which included Cumming, Steinberg, Jordan II, and Glaubinger (the "TLC Committee").

over 50 percent of Leucadia's outstanding shares.

On May 11, 1994, Pinnacle commenced the action giving rise to this appeal. In its complaint, Pinnacle asserted claims for violations of § 14(a) of the Exchange Act and RICO, as well as state common law claims for corporate waste, conversion, breach of fiduciary duty, and fraud. The alleged predicate acts under the RICO claim were four acts of mail and wire fraud. The first three predicate acts involved Leucadia's 1985, 1991 and 1992 Proxy Statements, which allegedly failed to disclose that the warrants would be issued to Cumming and Steinberg in violation of New York Business Corporation Law ("BCL") § 505. Pinnacle claimed that, because Leucadia's 1985, 1991, and 1992 Proxy Statements did not disclose that the issuance of these warrants would violate section 505, the proxy statements were false and misleading. The fourth predicate act allegedly was committed when Leucadia failed to disclose that TLC's voting of its Leucadia shares on the proposed merger would violate BCL § 612. Pinnacle asserted that, because Leucadia's interest in MIC gave Leucadia an indirect interest in TLC, section 612 prohibited TLC from voting any of the Leucadia shares it owned in favor of the proposed merger. Pinnacle claimed that the sole purpose of the merger was to "transfer direct control of Leucadia to Cumming and Steinberg," and that the defendants deliberately misled shareholders in the 1990 Proxy Statement in order to gain the shareholders' approval of the merger.

On July 29, 1994, the defendants moved to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6) and (1) for failure to state a claim upon which relief could be granted and for lack of subject matter jurisdiction. By order entered November 16, 1995, the district court granted defendants' motion to dismiss Pinnacle's federal law claims, as well as its state law claims for conversion and fraud, for failure to state a claim for relief. The district court found that Pinnacle's Exchange Act claim was barred by the statute of limitations. With respect to the RICO claims, the district court found that the Directors' failure to disclose alleged violations of section 505 in Leucadia's 1985, 1991 and 1992 Proxy Statements did not constitute predicate acts because the transactions at issue did not violate section 505, and therefore that Leucadia's proxy statements were not false or misleading. The district court then explained that, because a RICO violation cannot rest on one predicate act alone, Pinnacle's RICO claim failed. Nevertheless, the district court went on to find that, because the fourth predicate act was based on the Directors' failure to disclose a violation of section 612 in the 1990 Proxy Statement and because section 612 had not been violated, the 1990 Proxy Statement was not misleading and therefore could not support a claim of mail or wire fraud.

The district court then directed Pinnacle to submit additional evidence relating to the location of Pinnacle's principal place of business so it could determine if it had jurisdiction over the remaining state law claims. After Pinnacle submitted additional evidence, the district court determined that Pinnacle's principal place of business, like Leucadia's, was in New York. Accordingly, the court ruled that it lacked diversity jurisdiction over the remaining state law claims and dismissed the complaint in its entirety. This appeal followed.

## DISCUSSION

### I. RICO Claim

The first issue we address is whether the district court properly dismissed Pinnacle's RICO cause of action for failure to state a claim upon which relief may be granted. The district court found that Pinnacle had failed to plead a violation of the RICO statute, because it did not demonstrate violations of the BCL sufficient to establish the mail and wire fraud predicates. We agree.

■ We review de novo the district court's dismissal of the complaint under Rule 12(b)(6), and "tak[e] as true the factual allegations in the complaint." First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 765 (2d Cir.1994), cert. denied, —— U.S. ——, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995); see S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp., 84 F.3d 629, 633 (2d Cir.1996). In order to state a RICO claim, the plaintiff

must allege (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of § 1962. *Gelt,* 27 F.3d at 767. In establishing a violation of § 1962, the plaintiff must prove, *inter alia,* a "pattern of racketeering activity." 18 U.S.C. § 1962.

Racketeering activity includes the commission of specified state-law crimes, conduct indictable under various provisions within Title 18 of the United States Code, including mail and wire fraud, and certain other federal offenses. 18 U.S.C. § 1961(1); *see H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 232, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989). In order to prove a pattern, at least two related predicate acts must be shown, the last of which must have occurred within 10 years of a prior act of racketeering activity. 18 U.S.C. § 1961(5); *see also GICC Capital Corp. v. Technology Fin. Group,* 67 F.3d 463, 465 (2d Cir.1995) ("[P]laintiff must plead at least two predicate acts ... and must show that the predicate acts are related and that they amount to, or pose a threat of, continuing criminal activity." (citation omitted)), *cert. denied,* —— U.S. ——, 116 S.Ct. 2547, 135 L.Ed.2d 1067 (1996).

Pinnacle alleged four predicate acts involving mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343. The first three predicate acts involved Leucadia's 1985, 1991 and 1992 Proxy Statements, which Pinnacle alleged failed to disclose that the 1985, 1991 and 1992 Warrants would be issued in violation of BCL § 505. The fourth predicate act involved the 1990 Proxy Statement, which Pinnacle alleged failed to disclose a violation of BCL § 612(b). Pinnacle contends that the failure to make these disclosures rendered the proxy statements false and misleading. These acts would state a claim of mail or wire fraud if it were shown that the defendant knowingly or intentionally participated in a scheme to defraud using interstate mails or transmission facilities. *See S.Q.K.F.C.,* 84 F.3d at 633.

In this case, Pinnacle fails to state a claim with respect to a violation of BCL § 505. The statute provides in pertinent part:

(a)(1) Except as otherwise provided in this section ..., a corporation may create and issue ... rights or options entitling the holders thereof to purchase from the corporation, upon such consideration, terms and conditions as may be fixed by the board, shares of any class or series....

. . . .

(d) The issue of such rights or options to one or more directors, officers or employees of the corporation ..., as an incentive to service or continued service with the corporation, ... shall be authorized at a meeting of shareholders by the vote of the holders of a majority of all outstanding shares entitled to vote thereon, or authorized by and consistent with a plan adopted by such vote of shareholders....

. . . .

(h) In the absence of fraud in the transaction, the judgment of the board shall be conclusive as to the adequacy of the consideration, tangible or intangible, received or to be received by the corporation for the issue of rights or options for the purchase from the corporation of its shares.

N.Y. Bus. Corp. Law § 505 (McKinney 1986 & Supp.1996).

Pinnacle argues that section 505 was violated in two respects. First, Pinnacle contends that the warrants were given for past service and that past service does not constitute valid consideration under subdivision (h). Second, Pinnacle argues that the warrants were not issued as an incentive for continued or future service as required by subdivision (d). We reject both contentions.

Before the issuance of any warrant can be valid, it must be supported by adequate consideration. *See* BCL § 505(h). Pinnacle contends that 505(h) was not satisfied because it is "hornbook law" that past consideration is not valid consideration for a promise. While this may generally be true with respect to contracts, it is common ground that BCL § 504(a) expressly authorizes the issuance of stock in consideration of past services. However, Pinnacle asserts that the language expressly permitting past consideration for the purchase of stock in section

504(a) is missing from section 505(h), the consideration provision applicable to options and rights.

A comparison of sections 504(a) and 505(h) fails to reveal any meaningful distinction between the two provisions. Section 504(a) provides that "[c]onsideration for the issue of shares shall consist of money or other property, tangible or intangible, or labor or services actually *received* by or performed for the corporation." (Emphasis added.) Section 505(h) allows for "consideration, tangible or intangible, *received* or to be received by the corporation." (Emphasis added.) While 505(h) does not include a description of the various forms of consideration, it does include the operative word "received," which indicates that past consideration can support the issuance of rights and options.

Cumming and Steinberg began their service while Leucadia was struggling, and they oversaw its rise to prosperity. The directors and the shareholders were well aware of the dramatic turnaround that Leucadia experienced and could reasonably determine that the issuance of the warrants was deserved on the basis of past service. *Cf. Gazda v. Kolinski,* 91 A.D.2d 860, 458 N.Y.S.2d 387, 389 (App. Div. 4th Dep't 1982) (noting that it is valid to reward key employees), *aff'd in part,* 64 N.Y.2d 1100, 489 N.Y.S.2d 907, 479 N.E.2d 252 (1985). Because there has been no fraud shown in the issuance of the warrants, we hold that the Directors' business judgment is conclusive that valid consideration was received for the warrants. *See* N.Y. BCL § 505(h); *Clamitz v. Thatcher Mfg. Co.,* 158 F.2d 687, 693 (2d Cir.1947); *Buffalo Forge Co. v. Ogden Corp.,* 555 F.Supp. 892, 905 (W.D.N.Y.), *aff'd,* 717 F.2d 757 (2d Cir.1983); *Meshel v. Phoenix Hosiery Co.,* 17 Misc.2d 1035, 184 N.Y.S.2d 525, 531 (Sup.Ct.1957).[2]

Under New York law, a stock option plan is "tested against the requirement that [it] contain conditions, *or that surrounding circumstances are such,* that the corporation may reasonably expect to receive the contemplated benefit from the grant of the options." *Amdur v. Meyer,* 15 A.D.2d 425, 224 N.Y.S.2d 440, 443 (App. Div.3d Dep't 1962) (emphasis added), *appeal dismissed,* 14 N.Y.2d 541, 248 N.Y.S.2d 639, 198 N.E.2d 30 (1964). As Pinnacle points out, there were no express conditions on the face of the warrants here that required continued service. However, the circumstances were such that Leucadia could reasonably believe that Cumming and Steinberg would continue in its employ—as in fact they have.

Although Pinnacle argues that the warrants do not specifically commit Cumming and Steinberg to continued service, each of the 1985, 1991, and 1992 Warrants were structured to provide economic incentives to continue in the corporation's service and to serve the corporation well. *See SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 851 (2d Cir.1968) ("[T]he normal motivation induced by stock ownership [is the] identification of an individual with corporate progress."). The 1985 Warrants were issued at approximately 17 percent above the then market price of the stock. These warrants were worthless until the value of Leucadia's stock increased by at least 17 percent, providing a clear incentive to Cumming and Steinberg to continue improving Leucadia's financial position. The 1991 Warrants were issued at just above the then market price, providing a similar incentive to increase the value of the stock, although Cumming and Steinberg could more rapidly expect to reap some of those profits. The 1992 Warrants were issued at the then market price, but were not exercisable for at least nine months. This served as an inducement for Cumming and Steinberg not only to maintain their high quality of service to Leucadia, but also to remain with the corporation throughout the vesting period.

Pinnacle argues that there can be no incentive for continued service because both

---

**2.** Although *Clamitz* and *Meshel* were decided prior to the enactment of section 505 in 1961, their holdings are still relevant to this case, as section 505's provisions relating to the adequacy of consideration for the issue of options continued previous law. *See* Miguel A. de Capriles & Edward

J. McAniff, *The Financial Provisions of the New (1961) New York Business Corporation Law,* 36 N.Y.U.L.Rev. 1239, 1247–48 (1961) (BCL § 505(g) continued previous law); 1963 N.Y. Laws ch. 738, § 5 (recodifying section 505(g) as section 505(h)).

Cumming and Steinberg already were bound by contract to serve through 1994. However, this argument ignores the reality of employment and the rationale behind incentive compensation, which is that an employment contract does not necessarily guarantee that the employer will receive the employee's full efforts. These warrants helped guarantee a high level of performance by providing Cumming and Steinberg "an incentive to ... sharpen [their] interest, intensify [their] zeal, [and] spur [them] on to more ardent effort in the interest and for the benefit of the company." *Diamond v. Davis,* 38 N.Y.S.2d 103, 113 (Sup.Ct.), *aff'd,* 265 A.D. 919, 39 N.Y.S.2d 412 (App. Div. 1st Dep't 1942), *appeal denied,* 265 A.D. 1052, 41 N.Y.S.2d 191 (App. Div. 1st Dep't 1943). Therefore, we hold that these warrants would provide an incentive for continued service within the meaning of 505(d) under the circumstances of this case. *See Clamitz,* 158 F.2d at 693 (holding valid a stock option plan which contained no provision for continued employment and could be exercised at any time during the employment of the optionee).

Our holdings with respect to BCL § 505 leave only one alleged predicate act remaining—the violation of section 612(b). Because a RICO claim must be supported by at least two predicate acts, 18 U.S.C. § 1961(5); *see also H.J. Inc.,* 492 U.S. at 238, 109 S.Ct. at 2900; *GICC Capital Corp.,* 67 F.3d at 465, we need not address whether section 612(b) was violated, and hold that the district court properly dismissed Pinnacle's RICO cause of action pursuant to Rule 12(b)(6).

## II. Diversity Jurisdiction

The final issue we address is whether the district court properly dismissed Pinnacle's state law claims for lack of subject matter jurisdiction. Having dismissed Pinnacle's federal law claims, the district court's only remaining basis for exercising federal jurisdiction over Pinnacle's state law claims was diversity of citizenship under 18 U.S.C. § 1332. The district court found that diver-

sity jurisdiction did not exist because Pinnacle's principal place of business was New York, and thus Pinnacle, like Leucadia, was a citizen of New York. We agree.

We review *de novo* the district court's dismissal of an action for lack of subject matter jurisdiction, and we accept the district court's findings of fact unless they are clearly erroneous. *See In re Vogel Van & Storage, Inc.,* 59 F.3d 9, 11 (2d Cir.1995); *see also Chase Manhattan Bank, N.A. v. American Nat'l Bank & Trust Co.,* 93 F.3d 1064 (2d Cir.1996) (engaging in *de novo* review of legal conclusions). Diversity jurisdiction exists where a suit is between citizens of different states and the amount in controversy exceeds $50,000.[3] 28 U.S.C. § 1332(a). For diversity purposes, a corporation is "a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." § 1332(c).

■ The only question we must address is whether Pinnacle's principal place of business is New York.[4] A variety of tests exist to determine a corporation's principal place of business, *see, e.g., Harris v. Black. Clawson Co.,* 961 F.2d 547, 549 (5th Cir.1992) (utilizing the "total activity" test); *Kelly v. United States Steel Corp.,* 284 F.2d 850, 854 (3d Cir.1960) (adopting the "place of activities" test); *Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862, 865 (S.D.N.Y. 1959) (adopting the "nerve center" test), but the determination is "relatively straightforward when the corporation generally conducts its business policy and makes management decisions in a single state," *Kubin v. Miller,* 801 F.Supp. 1101, 1112 (S.D.N.Y. 1992). The instant case presents such a straightforward analysis. Pinnacle concedes that its board meetings take place in New York; all of its officers live in New York; its official mail is sent to New York; its corporate books and records are located in New York; its sole business is to hold 3,000 shares of Leucadia stock in New York; and "[a]ll major decisions affecting Pinnacle are

---

3. Congress recently has increased the amount in controversy requirement for diversity jurisdiction to $75,000. Federal Courts Improvement Act of 1996, Pub.L. No. 104-317, § 205, 110 Stat. 3847, 3850 (1996) (effective Jan. 17, 1997).

4. Neither the amount in controversy, Leucadia's incorporation in New York, nor Pinnacle's incorporation in Delaware are in dispute.

made by Anne–Renee Testa alone or in consultation with her husband, ... by telephone calls in New York City or in person at their home or at his office [in New York]." In fact, no corporate activity occurs in any other state, except the statutorily-required filing of an annual report and the payment of taxes in its state of incorporation, Delaware. Hence, there seems little question that Pinnacle's principal place of business is New York for diversity purposes.

Pinnacle argues that it is solely a citizen of Delaware, its state of incorporation, because it is inactive and therefore has no principal place of business. However, the diversity statute was designed to preclude such an argument, see *Egan v. American Airlines, Inc.*, 324 F.2d 565, 566 (2d Cir.1963), and we have rejected the notion that a corporation can exist without a principal place of business, see *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 141 (2d Cir.1991). Instead, we will find an inactive corporation's principal place of business to be the state where it last transacted business. *Id.* ("To allow inactive corporations to avoid inquiry into where they were last active would give them a benefit Congress never planned for them....").

Pinnacle's last reported business activity involved the purchase of additional shares of Leucadia common stock in 1994.[5] The decision to purchase was certainly made in New York, the transaction itself would have to have occurred in New York, and the stocks are held in New York. Thus, even if we accept Pinnacle's argument, its principal place of business would still be New York, because that is the state in which it last transacted business. Therefore, we hold that Pinnacle is a citizen of New York and that there is no diversity of citizenship.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed in all respects.

5. Pinnacle's argument that it was inactive is belied by the purchase of the additional Leucadia shares. Pinnacle defines its business as "the purchase and sale of stocks," which is exactly what it did in the months just prior to filing its complaint.