Frances Faye FRY and St. Louis Union Trust Company, Executors Under the Will of Benjamin W. Fry, Deceased, Plaintiffs-Appellants,

v.

NATIONAL REJECTORS, Inc., a Missouri Corporation, Defendant-Respondent.

No. 45667.

Supreme Court of Missouri, Division No. 2.

Nov. 12, 1957.

Tom R. R. Ely, St. Louis, for plaintiffs-appellants.

Fordyce, Mayne, Hartman, Renard & Stribling, Walter R. Mayne, St. Louis, for defendant-respondent.

BARRETT, Commissioner.

In this action against National Rejectors, Inc., the executors of the will of Benjamin W. Fry sought to recover the sum of $23,-262.47 on an employment contract. In January, 1951, Mr. Fry and National Rejectors entered into a contract by which Mr. Fry was employed as vice-president for the period of one year. His salary was $18,000 a year and in addition at the end of the year the profits of the company were to be computed, before taxes, and a "special account fund" set aside as a basis for the payment of "additional compensation." It was provided that the additional compensation should be computed on a graduated percentage basis beginning with five per cent on the first $50,000 of profits and ending with

twenty per cent on all profits over $300,000. On this basis Mr. Fry was paid additional compensation of $47,978 in 1951. Thereafter the contract was renewed from year to year and in 1952 he was paid $58,194 and in 1953, $41,610.86.

In 1953 the Bureau of Internal Revenue made an investigation of National Rejectors' records for the years 1951, 1952 and 1953 and charged the company with deficiencies due to the disallowance of a part of Mr. Fry's compensation on the ground that the twenty per cent bonus or additional compensation was excessive and, therefore, would not be allowed. The company's lawyers and auditors entered into negotiations with the bureau's agents and it was finally agreed that a bonus payment to Mr. Fry of 12½% would be accepted as reasonable and allowed. Accordingly the company settled the deficiencies for the three years by paying approximately $30,-000 in additional taxes and executing a "Waiver Of Restrictions On Assessment And Collection Of Deficiency In Tax."

Had Mr. Fry's 1954 compensation been paid according to the terms of the contract he would have received in additional compensation or bonus $62,033.24. But in December, 1954, the board of directors discussed the tax controversy and its settlement and concluded, in fairness to other stockholders and "so that there would be no further controversy with the Bureau of Internal Revenue," that Mr. Fry's compensation should be computed on the basis of 12½% of the profits as the payment of the 20% provided in the contract would result in a further tax deficiency of $12,096.48. Accordingly the board adopted a resolution modifying Mr. Fry's employment contract by reducing his 1954 bonus to 12½% of the profits. Mr. Fry became ill in October, 1953, and died in 1954 and the company paid his executors a bonus of $38,770.77 computed at 12½% of the profits and the executors instituted this action to recover the difference or additional compensation computed according to the terms of the contract, 20% of the profits or $23,262.47.

The case was submitted upon an agreed statement of facts and the testimony of the company's counsel and its secretary-treasurer and the trial court found that the executors were not entitled to recover.

Upon this appeal the controversy and the board's authority to modify the contract and reduce Mr. Fry's compensation for the year 1954 hinges on the interpretation and meaning to be given to clause six of the contract:

"The company, through its Board of Directors, reserves the right to modify, change, or discontinue the payments of additional compensation as provided in paragraph 3 above during the calendar year if in its judgment it finds it necessary (a) to conserve its cash position, (b) invest in capital expenditures (c) for expansion purposes, *or* (d) *for any other unusual or extraordinary contingencies.*"

The appellant executors contend that the employment contract was "an absolute promise to pay a certain percentage of the bonus account" unless, in the language of clause six, there were "unusual or extraordinary contingencies." And it is urged that the company's tax controversy and the assessment of a further deficiency of $12,096.48 was no concern of Mr. Fry's and was not an unusual or extraordinary contingency within the meaning of the contract. In 1954 the company's profits were $1,379,048 with a net profit of $550,099 after a tax bill of $828,948 and, therefore, the executors say that a deficiency assessment of $12,096.48 is by comparison an infinitesimal matter, and demonstrates that it was not an unusual or extraordinary contingency such as to authorize the company's unilateral modification of the contract. Other clauses of section six are pointed to as illustrative of the contingencies contemplated by the parties and it is urged that the tax problem was not of the magnitude or significance of necessity "to conserve its cash position," or for "capital expenditures," or for "expansion purposes." The

appellants and the respondent resort to the auxiliary rules of construction contending that the applicable rules make clear the intention of the parties and the interpretation to be placed upon the contract. Various definitions and illustrations of the meaning of the words "unusual" and "extraordinary" are set forth and it is argued that they demonstrate the contingencies contemplated by the contract.

But the definitions and illustrations only serve to demonstrate that "unusual" and "extraordinary" are not words of art and they do not always connote some event or occurrence of shattering or staggering magnitude. The auxiliary rules of construction are applicable and of force in only a general way. Upon this record there are no circumstances leading up to and attending the execution of the contract. We are not even informed as to the nature of National Rejectors' business—we only know that it is a corporation, that it entered into this contract with Mr. Fry and that in the four-year period it made considerable profits. We have no information concerning Mr. Fry—we only know that he was a vice-president, undoubtedly a stockholder, probably a director, and that he drew a handsome salary, which the government deemed excessive. We have no information as to his talents, duties or contributions to the company; from the contract we only know that he was employed as a vice-president and that he agreed "to advise, counsel and assist the management in connection with the operations of the company, and will render such other services as he may be called upon to perform by the Board of Directors and President of the company." Except for the facts concerning the profits, the payment of the salary, the tax controversy and the board's modifying the contract, there are no circumstances subsequent to the execution of the contract. In these meager circumstances the definitions and auxiliary rules do not compel a satisfying answer as to the meaning and interpretation to be placed upon that part of the contract which authorizes the company to modify the contract "for any other unusual or extraordinary contingencies."

And there are no precisely applicable analogies, but in the particular circumstances of this case there is a lesson to be had in considering the management of corporations in general, bonus or "additional compensation" plans, their nature and purpose, and the derivative actions by stockholders against directors and officers for certain wrongful conduct. Bonus or additional compensation plans to executive officers and others are not against public policy and are legal or illegal according to the purposes for which they are awarded and the circumstances in which they are authorized and paid. Putnam v. Juvenile Shoe Corp., 307 Mo. 74, 269 S.W. 593, 40 A.L.R. 1412. But a bonus is not a gift or gratuity and like the compensation of officers and directors must bear some reasonable relation to the services rendered. 5 Fletcher, Cyclopedia Corporations, Secs. 2133, p. 553, 2135, p. 562, 2143, p. 587. In the first instance incentive compensation is an affair of business to be handled in the unbiased judgment of the company's officers (Clamitz v. Thatcher Mfg. Co., 2 Cir., 158 F.2d 687), but a bonus plan may by reason of changed conditions become excessive, unfair and inequitable. Annotation, 164 A.L.R. 1125, 1130; Toebelman v. Missouri-Kansas Pipe Line Co., 3 Cir., 130 F.2d 1016. It may be, in some circumstances, that a tax advantage to the optionee of a bonus plan and its disadvantage to the corporation is an irrelevant matter, lacking in compelling significance (Harvey v. Missouri Valley Electric Co., Mo., 268 S.W.2d 820, 49 A.L.R.2d 1124; Eliasberg v. Standard Oil Co., 23 N.J.Super. 431, 92 A.2d 862), and yet there are instances in which the consideration of the company's tax disadvantage is of compelling force. Clamitz v. Thatcher Mfg. Co., supra; Mann v. Luke, Sup., 44 N.Y.S.2d 202. According to the government and the agreed facts Mr. Fry's compensation was excessive for income tax purposes (26 U.S.C.A. § 162) and the fact furnishes some basis for the inference that

it did not bear a reasonable relation to his services to the company for any purpose. The fact that the company settled the resulting tax deficiencies and executed a waiver of assessments for the three-year period may be a circumstance from which the inference could be drawn that the tax disadvantage to the company was a part of Mr. Fry's compensation and a mere incident to the contract but it does not, as a matter of law, constitute an estoppel. Liese v. Sackbauer, Mo., 222 S.W.2d 84. For income tax purposes the additional compensation of 20% of the profits was excessive and to that extent was not allowable as a business expense or as a deduction from taxable income and while tax liabilities, including deficiency assessments, may not be unusual or extraordinary contingencies, the contract did not contemplate further controversies with the government and additional penalties to the disadvantage of the company and its stockholders. Had the parties contemplated the additional tax liability as a mere incident of the contract they could have so stipulated. For the reasons indicated and in the limited, meager circumstances of this case the resulting tax problem and controversy were "unusual or extraordinary contingencies" within the meaning of the contract and justified the company's modification of Mr. Fry's employment contract. 5 Fletcher, Cyclopedia Corporations, Sec. 2143, p. 587; Toebelman v. Missouri-Kansas Pipe Line Co., supra; Clamitz v. Thatcher Mfg. Co., supra; Mann v. Luke, supra. Accordingly the judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.