Murray COHEN, Plaintiff,

v.

Thomas G. AYERS, William O. Beers, Archie R. Boe, Sidney L. Boyar, James W. Button, Alfred I. Davies, Luther H. Foster, Jack F. Kincannon, John G. Lowe, Gordon M. Metcalf, Charles A. Meyer, Aurelio M. Prado, Julius Rosenwald, II, William I. Spencer, Edgar B. Stern, Jr., A. Dean Swift, Edward R. Telling, W. Wallace Tudor, Thomas F. Wands, Arthur M. Wood, and Sears, Roebuck & Co., Defendants.

No. 76 C 4312.

United States District Court, N. D. Illinois, E. D.

April 3, 1978.

Garwin & Bronzaft, New York City, Harrold W. Huff, Robert E. Kehoe, Jr., and Anne Giddings Kimball, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for plaintiff.

Henry J. Silberberg, New York City, for defendants Ayers, Beers, Boe, Button, Davies, Kincannon, Lowe, Prado, Rosenwald, Swift, Telling and Wood.

Joseph J. Skinner, New York City, Arthur Medow, Chicago, Ill., for defendant Sears, Roebuck & Co.

Richard K. Wray, John F. McClure, Burton Y. Weitzenfeld, Arnstein, Gluck, Weitzenfeld & Minow, Chicago, Ill., for defendants Foster, Meyer, Metcalf, Stern, Tudor and Wands.

## MEMORANDUM OPINION

MARSHALL, District Judge.

This is a derivative action brought by one minority shareholder, Murray Cohen, against Sears, Roebuck and Co. (Sears) and several of its directors and former directors. Plaintiff attacks part of the administration of Sears' 1967 and 1972 stock option plans. Plaintiff contends that defendants breached common law duties and violated § 14(a) and § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a), 78j(b). The action was filed in the United States District Court for the Southern District of New York and was transferred here pursuant to 28 U.S.C. § 1404(a). Defendants' motion for summary judgment is ready for decision. Also pending is defendants' motion to strike the affidavit of Bertram Bronzaft, one of the attorneys for plaintiff, which was filed in opposition to defendants' motion for summary judgment.

Subject matter jurisdiction over the federal securities allegations is based upon § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. With respect to the common law aspects of the case, subject matter jurisdiction is asserted on the basis of diversity jurisdiction, 28 U.S.C. § 1332, and principles of pendent jurisdiction. The complaint alleges that plaintiff is a citizen of New Jersey and that defendant Sears is a New York corporation with its principal place of business in Illinois. As for the individual defendants, the complaint alleges that the defendants are citizens of states other than New Jersey, but that "diversity of citizenship jurisdiction is asserted only with respect to defendants who are not citizens of the state of New Jersey." Defendants have admitted the allegations concerning the citizenship of all defendants.

■ With respect to the state law claims, we must determine which state's law is applicable. *Dreis & Krump Mfg. Co. v. Phoenix Ins. Co.*, 548 F.2d 681, 682 (7th Cir. 1977). Under both Illinois and New York conflict rules, New York law governs the issues. Sears is incorporated in New York and the law of the state of incorporation governs the internal affairs of a corporation. *Rogers v. Guaranty Trust Co.*, 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652 (1933); *Paulman v. Kritzer*, 74 Ill.App.2d 284, 219 N.E.2d 541 (1966), *aff'd*, 38 Ill.2d 101, 230 N.E.2d 262 (1967); N.Y.Bus.Corp.Law § 103.

### I. Statement of Facts

For many years, Sears has periodically granted stock options to key employees and officers. The purpose of the stock option program is to encourage valued employees to acquire a proprietary interest in Sears as an incentive to spur them to give their best efforts to the corporation. Key employees are those who are exempt from the Fair Labor Standards Act, and now include over 15,000 of Sears' supervisory employees. Typically, the Board of Directors of Sears secured prior approval of its plans from the shareholders.

Generally, employee stock option plans are designed to entice valuable corporate employees to remain with the corporation. They are a useful and relatively inexpensive alternative to offering large salaries that will be consumed by taxes. To increase the net salary of employees in high income brackets, the corporation must pay much more than the executive actually receives. Stock options avoid this problem in part. See Comment, *Stock Compensation*

*Plans,* 1971 Wis.L.Rev. 854, for a discussion of tax implications of stock option programs. One problem with stock option compensation is that the value of the options is uncertain. Assuming that the option is granted for exercise at a fixed price, the option only has value if the market price exceeds the option price. In a rising market, stock options can be a real windfall to the employee. But in the early 1970's the stock market generally and Sears shares specifically declined in value. This case arises out of the efforts of Sears' management to salvage its stock option program after the market decline. We begin with a description of Sears' 1967 and 1972 stock option plans.

In 1967, the Board of Directors of Sears issued a proxy statement recommending that the stockholders authorize the grant of options covering up to 3,000,000 shares of stock to various key employees of Sears. The 3,000,000 options were to include 300,000 shares for employees who were also directors. The plan provided that the Board of Directors would appoint a committee of non-employee disinterested directors who would select the key employees to receive options and how many options each employee would receive. This committee was known as the Salary and Supplemental Compensation Committee. According to the plan, the options could be qualified under § 422 of the Internal Revenue Code for favorable tax treatment as capital gain, or they could be nonqualified for favorable tax treatment. The plan did not set a specific price for shares, but did require that the price per share be at least the fair market value of Sears' common shares on the date the option was granted. The plan gave to the Board of Directors the power to grant options upon such terms and conditions as it might authorize. It also vested the Board with the power to "prescribe such provisions and interpretations not inconsistent herewith as it shall deem necessary for carrying out the purposes of the Plan." In addition, the plan provided that if an employee died or if his or her employment was terminated, the options would lapse after a short interval. Qualified options were to be

exercised within five years from the date of grant and nonqualified options were valid for ten years. No options were to be granted under the 1967 plan after November 1, 1976. Without defining the terms "expired" or "terminated," the plan stated that the unpurchased shares under expired or terminated options might again be optioned under the plan. The plan made no mention of cancelling options. The proxy statement, but not the 1967 plan itself, advised that only the shareholders could amend the plan. This plan was adopted by majority vote of the shareholders.

In 1972, the Board of Directors adopted a resolution recommending that the shareholders approve another stock option plan, this time authorizing options to purchase a total of 4,000,000 shares, including 300,000 for employee-directors. As in 1967, the Board of Directors issued a proxy statement to its shareholders in which it described the plan generally and reprinted the text of the plan. There were few differences between the description of this plan and that of the 1967 plan, and most of the differences resulted from changes in the tax consequences of the options due to changes in the Internal Revenue Code since 1967. The provisions of the 1972 plan concerning the granting of options, the administration of the program, and termination of option rights were substantially the same as in the 1967 plan. By a majority vote, the shareholders authorized this plan.

After the shareholders approved the 1967 plan, the Board of Directors began to grant stock options under it. The Salary and Supplemental Compensation Committee, which selected the optionees, consisted of five directors who were not Sears employees. Although the Committee was authorized to select employees to receive options, it relied heavily upon the recommendations of management. Under the direction of the vice president in charge of personnel, management developed a formula for selecting employees and appropriate number of options. That formula took into account suggestions from the territorial administrative offices, as well as from the central person-

nel office. The final recommendations were then presented to the Committee, which always approved them without change.

On September 21, 1967, the Board granted options for 2,260,016 shares to key employees, including employee-directors. The price of these options was $56.82 per share, the market price of Sears shares at that time. Over the next four years, many of the options were exercised, and a number of them lapsed. Another grant of options was made in June of 1971, for a total of 621,612 options at a price of $89.82 per share, the market price at that time. Only 11,543 of these options were exercised. The market price of Sears stock continued to rise in the early 1970's. Consistent with the plan provision that the price per share must be at least the market value of the shares, the exercise price for grants of options during this time rose as well. On December 12, 1972, options were granted at $116.44 per share under the 1967 plan and under the newly authorized 1972 plan. Options were also granted under both plans on April 2, 1973 at $101.13 per share.

About this time, the market turned around and began to decline. Sears employees now held options granted in 1972 and 1973 that they had no reason to exercise, for the market price had fallen below the option price. Indeed, none of the options granted in 1972 and 1973 were ever exercised. Toward the end of 1973, the Salary and Supplemental Compensation Committee recommended to the Executive Committee of the Board of Directors that each employee who received an option in 1972 or 1973 be offered a new nonqualified option for the outstanding number of shares if the employee cancelled all the old options before the replacement options were issued. In effect, though not in form, Sears proposed to lower the option price on outstanding options granted in 1972 and 1973. The Executive Committee of the Board of Directors, with one member ab-

sent, unanimously approved this proposal. Six of the nine members of this committee were employee-directors who held options themselves.

Accordingly, on December 17, 1973, the Chairman of the Board of Sears offered recipients of qualified and nonqualified options granted in December, 1972 at $116.44 per share and in April, 1973 at $101.13 per share the opportunity to cancel their options and receive in exchange a grant of the same number of unqualified options at the market price current in January, 1974. This price would be lower than $101.13.[1] All of the optionees elected to cancel their options, and new options were granted at $85.94 per share, including some options that were not replacement options. The price of Sears stock continued to decline after January, 1974 and none of the options granted at $85.94 per share were ever exercised. In the autumn of 1974, the Salary and Supplemental Compensation Committee repeated its recommendation to cancel options. This time, the entire Board of Directors and not merely the Executive Committee approved the recommendation.

In September, 1974 the Chairman of the Board of Directors again notified optionees that the 1974 options at $85.94 and the 1971 options at $89.92 per share could be cancelled and new options granted at the then current market price. Most of the optionees elected to cancel their options. Early in 1975, a second set of replacement options was granted at $52.19 per share. Although the 1975 replacement options were granted to employee-directors and other employees, the number of replacement options was not the same for the two categories. The employees who were directors received replacement options for a number equal to 75% of the number of options cancelled. Other employees received options in 1975 for a number of options equal to or greater than the number of options that they cancelled. Finally, to-

---

1. Under § 422 of the Internal Revenue Code, the price of options could not be lowered, even by cancellation or recission, and remain qualified. See Comment, *Stock Compensation Plans*, 1971 Wis.L.Rev. 854, 859. Therefore, Sears' replacement options were all unqualified.

ward the end of 1975, additional options were granted at $66.57 per share.

In March, 1976, this action was filed in the Southern District of New York. About five months later, the Board of Directors distributed a proxy statement to all shareholders calling a special meeting to ratify the directors' actions in cancelling and regranting options. The specific purpose of the proposal was to expedite the end of this litigation. The 1976 proxy statement described the 1967 and 1972 plans and the cancellation and regrant of options in 1973 through 1975. It stated that the Board of Directors believed that their actions were authorized by the plans. It included detailed information about the employee-directors' salaries, and a tabulation showing options granted, exercised, cancelled and regranted to this group of optionees. Finally, the text of both the 1967 and the 1972 option plan, and a copy of the original complaint in this action were attached.[2] Of the 158,753,361 shares entitled to vote, the resolution ratifying the directors' actions was adopted by a vote of 104,801,263 shares in favor and 15,854,918 shares opposed.

From our review of plaintiff's amended complaint and memorandum, we extract four theories of liability. First, plaintiff asserts that the cancellations and regrants of options which occurred from 1973 to 1975 are inconsistent with the 1967 and 1972 plans. The Board exceeded its authority and therefore its actions are void. Second, plaintiff contends that the same activities are void because the actions were initiated by directors who were optionees themselves and were interested in the transaction. In other words, the directors breached their duty of undivided loyalty to the corporation. Third, the regrants of options at lowered prices constituted waste, in that the directors made a gift of corporate assets to themselves and others. Finally, the directors' actions violated federal securities laws. Defendants' motion for summary judgment addresses all four theories.

## II. Shareholder Authorization

Plaintiff's first argument is that both cancellations and regrants of options are inconsistent with and unauthorized by the express provisions of the 1967 and 1972 plans, and therefore void. As plaintiff interprets the plans, the minimum price provisions, when read with the limitations on the number of shares available for options, were intended to guard against precisely the manipulation of the plans that occurred. Plaintiff contends that the shareholders understood that the plan was a gamble. The optionees would receive a bargain only if the market value of the shares increased. The limit on the aggregate number of options that could be granted solidified this understanding, because without that limitation, the Board could have issued new options every time the market declined. Since the use of replacement options was an artifice to evade this restriction in the plans, it was actually an amendment to the plans. Therefore, the approval of the shareholders was necessary, in accordance with the language in the proxy statements that the plans could not be amended without shareholder approval. Plaintiff also points out that the 1962 Sears stock option plan expressly reserved to the Board of Directors the power to reduce the purchase price per share if the market price of the shares fell by a certain percentage. Plaintiff infers that the absence of a similar clause in the 1967 and 1972 plans demonstrates that the Board decided not to reserve the power to lower the price of the options without prior shareholder approval.

In response, defendants say that they did not violate the maximum share limitations, because replacement options were not granted until previously granted options had been cancelled. Relying on their power, specified in both plans, to re-option shares under expired or terminated options, defendants say that their actions were fully authorized. In response, plaintiff suggests that according to the plans, options "expire" or "terminate" only when the optionee dies or leaves the employ of Sears,

2. The amended complaint was filed after the proxy statement was issued.

and that this provision does not give management leave to adjust the price of options at will.

In attacking the validity of the cancellations and regrants of options, plaintiff appears to rely on principles of contract and agency law. Treating the 1967 and 1972 plans as contracts, he argues that defendant directors breached the contracts, exceeding their authority, and that their actions are void as a result. *Waltzer v. Billera, supra.* For their part, defendants agree that stock option plans are governed by contract principles. *See Meshel v. Phoenix Hosiery Co.,* 17 Misc.2d 1035, 184 N.Y.S.2d 525, 529 (1957); *Diamond v. Davis,* 38 N.Y.S.2d 103, 112 (1942), *aff'd,* 265 App.Div. 919, 39 N.Y.S.2d 412, *aff'd,* 292 N.Y. 552, 54 N.E.2d 683. They argue that the parties to an executory agreement can agree to rescind the agreement, and nothing in the plans prevented the optionees and the corporation (or its directors) from cancelling the options before they were exercised. Defendants conclude that their actions are consistent with and authorized by the plans.

In part, the disagreement as to the validity of the directors' action may arise from the peculiar nature of stock option arrangements which are authorized by shareholders. It is possible to treat them as two separate contracts as well as a single transaction. The first would be the plan itself and the second, the individual grants of options to employees under the plan. Plaintiff focuses on the first part of the total arrangement, the stock option plan itself. He seems to assert that it is a contract between the shareholders and the corporation. The directors, acting for the corporation, allegedly breached the plan by lowering option prices. It is unclear what the consideration might be if the stock option plan itself is a contract. Defendants' analysis, however, focuses on the actual grant of options. At this second stage, the shareholders are no longer directly involved. Instead, the contract is between the directors or the corporation, which grant the options,

and the optionee, who receives them. Defendants assert that if the option plan does not flatly prohibit cancellation, the parties to the second contract may agree to rescind. And the optionees, who received the replacement options at lowered prices, obviously do not complain of the directors' actions. Each of these attempts to structure the dispute in terms of contract analysis misses the mark. Defendants' contract argument overlooks the effect of the stock option plan. Plaintiff, on the other hand, strains to construe the plan as a contract when it is more akin to an authorization.[3]

We think that a more illuminating approach to this issue can be found by looking at principles relating to the powers of corporate directors, and upon a provision of the New York corporation statute dealing with employee stock options. Generally speaking, the directors have the power to manage the affairs of the corporation, including the matter of executive compensation. *Greenbaum v. American Metal Climax Inc.,* 27 A.D.2d 225, 278 N.Y.S.2d 123 (1967); 5 Fletcher, *Cyclopedia Corporations* § 2100 (Perm.Ed.1976). The corporation's charter and by-laws, and any applicable statutes, however, do limit the powers of directors, and when directors step beyond the limits set by these guidelines, their actions may be void. *Rogers v. Guaranty Trust Co.,* 288 U.S. 123, 136–40, 53 S.Ct. 295, 77 L.Ed. 652 (Stone, J., dissenting) (1933).

Section 505 of the New York Business Corporation Law does restrict the powers of directors in granting stock options to employees. Section 505(d) provides:

The issue of such rights or options to directors, officers, and employees of the corporation or a subsidiary or affiliate thereof, as an incentive to service or continued service with the corporation, a subsidiary or affiliate thereof, or to a trustee on behalf of such directors, officers and employees, shall be authorized at a meeting of shareholders by the vote of the holders of a majority of all outstanding shares entitled to vote thereon, or

---

**3.** For a critique of looking at stock option arrangements as two contracts, *see* J. Ward, *Two-Contract Analysis May Imperil Stock Option Plans,* 52 Mich.L.Rev. 849 (1954).

authorized by and consistent with a plan which was authorized by such vote of shareholders.

If the defendants' manipulation of the plans does not violate § 505(d), their actions are not void, and the options are enforcible. *Scarpinato v. Nat. Patent Dev. Corp.*, 75 Misc.2d 94, 347 N.Y.S.2d 623 (1973). The statute permits two different types of shareholder approval of stock options to employees. First, the shareholders may approve a plan for issuing options. If so, § 505(d) mandates that the grant of options be authorized by and consistent with the plan. Alternatively, § 505(d) allows the shareholders to authorize a particular grant of options regardless of any plan.

■ Plaintiff's arguments tend to show that the cancellations and regrants of options are inconsistent with the 1967 and 1972 plans. Assuming that plaintiff is correct—and we do not find it necessary to decide this difficult question—his argument does not refute the alternative method of shareholder authorization of the particular grant of options.[4] If this authorization was obtained, the regrant of previously cancelled options was valid, despite any inconsistency with the 1967 and 1972 plans. Here, this authorization was accomplished by the shareholder ratification on October 13, 1976.

■ Although § 505(d) does not speak in terms of ratification, permitting authorization of the option grants by ratification is entirely consistent with agency principles and with decisions of the New York courts. Usually, shareholders may ratify acts done by the board of directors, provided that the shareholders could have originally authorized the acts. 2 Fletcher, *Cyclopedia Corporations*, § 764 (Perm.Ed.1969). New York courts have consistently held that ratification by a majority of shareholders cures the defect that action by the directors was not authorized. *Rosenfeld v. Fairchild Engine*

*and Airplane Co.*, 309 N.Y. 168, 128 N.E.2d 291 (1955); *Continental Securities Co. v. Belmont*, 206 N.Y. 7, 99 N.E. 138 (1912); *Lyon v. Holton*, 172 Misc. 31, 14 N.Y.S.2d 436 (1939).

■ Plaintiff interposes a number of insubstantial objections to the ratification. To the extent that plaintiff asserts that ratification is ineffective because the authorization is retroactive, the assertion is unfounded. Ratification is by definition retroactive, but it is nevertheless equivalent to prior authority. *Knapp v. Rochester Dog Protective Ass'n*, 235 App.Div. 436, 257 N.Y.S. 356, 361 (1932). It is effective even though initiated in response to a lawsuit. *Diston v. Loucks*, 62 N.Y.S.2d 138 (Sup.Ct. 1941).

■ Next, plaintiff argues that even if shareholder ratification may be equivalent to prior authorization, the ratification of October 13, 1976 was defective because the proxy statement was false and misleading.[5] First, plaintiff argues that the proxy statement should have disclosed information relating to the formation of the 1967 and 1972 plans, as well as information about the 1962 plan and the administration of prior stock option plans. Under § 505(d), however, all that was necessary was shareholder approval of the particular grant of options. The shareholders quite properly were not asked to vote on whether the 1974 and 1975 grants of replacement options were authorized by the 1967 and 1972 plans, or whether they were consistent with administration of prior stock option plans. Therefore, these disclosures were unnecessary.

Plaintiff also states that the following information should have been disclosed on the proxy statement: 1) that six of the nine directors on the Executive Committee, which approved the 1973 cancellation, were optionees themselves; 2) that the replacement options granted to 85 older employees

---

4. We agree that if the plan clearly gave the directors the power to lower the option price, the directors' actions would have been authorized. *Udoff v. Zipf*, 58 A.D.2d 533, 395 N.Y. S.2d 473 (1977).

5. Plaintiff does not contend that this proxy statement violates § 14(a) of the Securities and Exchange Act of 1934. *Compare* Part IV of this opinion, *infra.*

near retirement could be exercised at a faster rate than options granted to other employees; 3) the name of plaintiff's attorney; 4) that the Salary and Supplemental Compensation Committee never acted independently; 5) that this Committee lacked the power to cancel options. Section 505(d) does not indicate how many details must be disclosed before shareholder authorization is effective.[6] In the absence of a clear statutory standard, we note that the 1976 proxy statement is far more detailed than the 1967 and 1972 proxy statements which were used to obtain the original authorization for the plans. The shareholders had before them a copy of plaintiff's complaint, copies of the 1967 and 1972 plans, and detailed information about the number of options issued and exercised by the employee-directors. The proxy statement even summarized Sears' mandatory retirement policy and gave the ages of the directors who received options, so the shareholders were aware that several of them were near retirement. The shareholders were able to communicate with plaintiff's attorney through the plaintiff, and one shareholder wrote directly to the court when the action was pending in the Southern District of New York.

██ Undoubtedly more could have been said. Nevertheless, we think that the proxy statement sufficiently informed the shareholders of the circumstances surrounding the cancellation and the regrant of options. We reject the argument that it was necessary to include information about the composition of the Executive Committee, the name of plaintiff's attorney, and the specific terms of replacement options granted to employees near retirement. As for the omissions about the independence of the Salary and Supplemental Compensation Committee, defendants strongly assert that they are not true. The proxy statement did not need to include statements, when defendants dispute their veracity.

██ Next, plaintiff argues that the votes of the interested shareholders should be disregarded in determining whether a majority of shareholders voted in favor of the ratification proposal. This contention is frivolous. A shareholder is clearly entitled to vote upon a matter in accord with his or her personal interest. Shareholders, unlike directors and officers, are not bound by the fiduciary duty of loyalty to the corporation. *Gamble v. Queens County Water Co.*, 123 N.Y. 91, 25 N.E. 201, 202 (1890); 5 Fletcher, *Cyclopedia Corporations*, § 2031 (Perm.Ed. 1976).

### III. Interested Directors

Next, plaintiff contends that both cancellations and regrants of options at lower prices are invalid because 12 of the 23 directors of Sears were beneficiaries of the stock option maneuvering. The directors, therefore, breached the fiduciary duty of loyalty to the corporation. As we understand it, this argument does not question the validity of the 1974 and 1975 grant of replacement options to all employees, but only attacks the grant of replacement options to directors. Plaintiff contends that directors are fiduciaries and are under a strict duty to act under the highest of standards.

Archaic New York cases held that actions of interested directors are fraudulent and void. *Munson v. Syracuse, Geneva and Corning Ry.*, 103 N.Y. 58, 8 N.E. 355 (1886). Later cases modified this rule and held that transactions involving interested directors were voidable rather than void. *Barr v. New York Ry. Co.*, 125 N.Y. 263, 26 N.E. 145 (1891). Moreover, at one time the board of directors was prohibited from fixing compensation of its members without specific authorization by statute or in the corporate by-laws. *Godley v. Crandall &*

---

6. In comparison, Rule 14a–9, 17 C.F.R. § 240.-14a–9, implementing § 14(a) of the Securities and Exchange Act of 1934, requires that proxies be free of false and misleading statements and include statements necessary to avoid leaving a misleading impression. Similarly, § 713(a)(2) of the N.Y. Bus. Corp. Law requires that when shareholders ratify acts of interested directors, they must be aware of the directors' interest. Unlike § 505(d), both of these statutory provisions establish a standard for testing the adequacy of disclosure.

*Godley Co.,* 212 N.Y. 121, 105 N.E. 818 (1914). The New York legislature has long since modified the common law and lowered the degree of loyalty owed to a corporation by its directors from "the punctilio of an honor the most sensitive," *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928) (Cardozo, J.) to a standard of reasonableness. *See generally,* Comment, *"Interested Director's" Contracts—Section 713 of the New York Business Corporation Law and the "Fairness" Test,* 41 Fordham L.Rev. 639 (1973). Section 713(e) of the N.Y. Bus. Corp. Law permits a board of directors to fix the compensation of directors for services in any capacity unless otherwise provided in the certificate of incorporation or by-laws. And § 713(a) and (b) establish procedures for approving transactions by interested directors, and a standard for reviewing such transactions in the absence of approval by the shareholders or the disinterested directors. In full, § 713(a) and (b) provide:

§ 713. *Interested directors*

(a) No contract or other transaction between a corporation and one or more of its directors, or between a corporation and any other corporation, firm, or association or other entity in which one or more of its directors are directors or officers, or have a substantial financial interest, shall be either void or voidable for this reason alone or by reason alone that such director or directors are present at the meeting of the board, or of a committee thereof, which approves such contract or transaction, or that his or their votes are counted for such purpose:

(1) If the material facts as to such director's interest in such contract or transaction and as to any such common directorship, officership or financial interest are disclosed in good faith or known to the board or committee, and the board or committee approves such contract or transaction by a vote sufficient for such purpose without counting the vote of such interested director or, if the votes of the disinterested directors are insufficient to constitute an act of the board as defined in section 708 (Action by the board), by unanimous vote of the disinterested directors; or

(2) If the material facts as to such director's interest in such contract or transaction and as to any such common directorship, officership or financial interest are disclosed in good faith or known to the shareholders entitled to vote thereon, and such contract or transaction is approved by vote of such shareholders.

(b) If such good faith disclosure of the material facts as to the director's interest in the contract or transaction and as to any such common directorship, officership or financial interest is made to the directors or shareholders, or known to the board or committee or shareholders approving such contract or transaction, as provided in paragraph (a), the contract or transaction may not be avoided by the corporation for the reasons set forth in paragraph (a). If there was no such disclosure or knowledge, or if the vote of such interested director was necessary for the approval of such contract or transaction at a meeting of the board or committee at which it was approved, the corporation may avoid the contract or transaction unless the party or parties thereto shall establish affirmatively that the contract or transaction was fair and reasonable as to the corporation at the time it was approved by the board, a committee or the shareholders.

Whether the cancellations and regrants of options to directors is invalid because the directors were interested must be tested by § 713. If either shareholder or director approval was obtained, it is unnecessary to require the defendants to "affirmatively establish that the . . . transaction was fair and reasonable" when made.

Relying on the procedural tests of § 713, defendants contend that both the disinterested directors and the shareholders approved the disputed actions, and we need not explore the fairness test. Our independent examination of the uncontested documents and affidavits shows that the Board of Directors unanimously approved the 1974 cancellation of options in compliance with

§ 713. With respect to the 1973 cancellation, however, there are some discrepancies between the directors' and shareholders' approval and the requirements of § 713. The New York Court of Appeals has recently required strict compliance with § 713. *Rapoport v. Schneider,* 29 N.Y.2d 396, 328 N.Y. S.2d 431, 278 N.E.2d 642, 646 (1972).

The problem is that the vote of the Executive Committee, which approved the initial cancellation recommendation by the Salary and Supplemental Compensation Committee in 1973, was insufficient. The defect is not that the Executive Committee lacked the power to authorize the cancellation. Both § 712 of the N.Y. Bus. Corp. Law and Sears' by-laws empower an Executive Committee to act in lieu of the Board of Directors, with certain exceptions not relevant here.[7] Rather, the problem is that the record is not free from doubt on whether the vote of the Executive Committee complied with § 713(a)(1). Six of the nine members of the Executive Committee were interested. Since more than half of the members were interested, it was essential that all of the disinterested directors participate in the vote.[8] But only eight of the nine members of the Executive Committee were present when the vote was taken. If the absent committee member was interested, his vote was unnecessary. If the absent committee member was disinterested, his vote was essential. There is a question of fact, therefore, regarding the validity of the first cancellation under § 713.

█ Nevertheless, considering all of the circumstances, this possible defect in the authorization procedure for the first cancellation does not entitle plaintiff to a trial. After the 1973 cancellation, replacement options were issued at approximately $85.00 per share, but none of these options were ever exercised. Therefore, the corporation could not have been harmed by any defects in the authorization procedure which resulted in the first cancellation. Moreover, the material facts as to all the directors' interests in the stock option plans of 1967 and 1972, and the transactions undertaken, were disclosed to the shareholders in the 1976 ratification proxy statement. The shareholders ratified the transactions by a majority vote, and therefore the interested directors' transactions were approved in accordance with § 713(a)(2) of the New York Business Corporation Law. We conclude that defendants are entitled to summary judgment on the claim that the cancellations and regrants of options are void because the directors were interested.

## IV. Adequacy of Consideration

█ In this part of his attack, plaintiff contends that the reduction in prices was not supported by consideration, that the lowering of option prices constituted a gift to directors and other optionees, and that the directors wasted corporate assets. Defendants counter that consideration was given for the stock options and that under § 505(h) of the New York Business Corporation Law, the *judgment of the Board as to the adequacy of consideration is conclusive in the absence of fraud.* Under this codification of the business judgment rule, their actions, they claim, are not subject to court review.[9]

7. Section 712(a) provides: "If the certificate of incorporation or the by-laws so provide, the board, by resolution adopted by a majority of the entire board, may designate among its members an executive committee, . . . which, . . . to the extent provided in the resolution or in the certificate of incorporation or by-laws, shall have all the authority of the board . . ."

8. To explain this requirement more fully, § 713 states that approval of an interested director transaction must be by a vote sufficient for such purpose without counting the votes of the interested directors. Section 708(d) of the N.Y. Bus. Corp. Law provides that the vote of a majority of directors present at the time the vote is taken shall be the act of the board, if a quorum is present. If more than half of the directors present are interested, it is impossible to secure action of the board. In that event, § 713 provides that all the disinterested directors, and not only the disinterested directors who are present, must approve.

9. Defendants also argue that the shareholder ratification cured any defect in their conduct,

Challenges to stock option arrangements on the basis of inadequate consideration have been presented to the courts frequently. When the stock value on the market is rising, the usual fact pattern is that options are granted at a relatively low price and exercised when the market value of the shares is much higher. Then the plaintiff shareholders contend that the grant of options at the low price was not supported by consideration and is a gift of corporate assets to the optionee. *E. g., Clamitz v. Thatcher Mfg. Co.*, 158 F.2d 687 (2d Cir. 1947); *Abrams v. Allen*, 266 App.Div. 835, 42 N.Y.S.2d 641 (1943); *Wyles v. Campbell*, 77 F.Supp. 343, 350 (D.Del.1948). When, on the other hand, the market price falls below the option price, and the corporation makes some change to salvage the purpose of the options as an incentive to key employees, the plaintiff shareholders focus on the change and assert that the directors may not lower the price because that would not be supported by consideration. It may also be argued that lowering the price excuses poor performance by the optionees. *E. g., Israel v. Awad*, 53 A.D.2d 529, 384 N.Y.S.2d 183 (1976); *Amdur v. Meyer, supra*. The instant lawsuit is an example of the latter fact pattern.

Whatever the direction of the market fluctuation, courts have developed a series of principles to test such attacks on stock options. A board of directors may not grant stock options for no consideration. They have no power to give away the assets of the corporation and are liable to the corporation for waste if they do so, whether or not they benefit personally. *Meshel v. Phoenix Hosiery Co., supra; Diamond v. Davis, supra*. Minority shareholders may bring a derivative action to recover for waste if the grant of stock options is a gift. *Accord, Rapoport v. Schneider, supra; Selman v. Allan*, 121 N.Y.S.2d 142 (Sup.Ct. 1953); N.Y. Bus. Corp. Law § 720(a)(1)(B).

If the grant of stock options is supported by consideration, it is not a gift.

The stock option cases have evolved a flexible concept of consideration, and hold that it is adequate if the corporation receives something of value, usually the continued services of the employees. *Beard v. Elster*, 39 Del.Ch. 153, 160 A.2d 731 (1960); *Amdur, supra*. *See Annot.*, Sufficiency of Consideration for Employee Stock Option Contract, 57 A.L.R.3d 1241–64 (1974). More precise balancing between the value flowing to the corporation and the value flowing to the optionee is impossible. Not only are courts ill-equipped to undertake such a task, but commentators have noted that there is no realistic method for arriving at a dollar value for stock options. *E. g.*, Dean, *Employee Stock Options*, 66 Harv.L.Rev. 1403, 1422–27 (1953). Therefore, if minimal consideration is present, courts defer to the business judgment of the board of directors. *Clamitz, supra; Amdur, supra*. This judicial caution is consistent with a long line of cases holding that boards of directors have the power and authority to manage the affairs of the corporations, and that their decisions will not be questioned when they act in accord with their best judgment. *Chelrob v. Barrett*, 293 N.Y. 442, 57 N.E.2d 825, 833 (1944); *Continental Securities Co. v. Belmont, supra; Sandfield v. Goldstein*, 33 A.D.2d 376, 308 N.Y.S.2d 25, 29 (1970).

The question, therefore, is whether the modification of the option price was supported by consideration. The parties agree that the optionees received something of value when the Board of Directors gave them an opportunity to lower the price of the options they held. They disagree as to the actual dollar value of the modification, but we need not resolve their dispute. Neither side would deny that the old options were worth little or nothing because the exercise price was higher than the market price, and that the market price soon exceeded the price of the replacement options granted in 1975. Since the optionees received a benefit, we must determine whether that benefit was unilateral. We are of

but ratification by less than all the shareholders cannot cure wasting corporate assets. *Amdur v. Meyer*, 15 A.D.2d 425, 224 N.Y.S.2d 440, 444 (1962); *Diamond v. Davis, supra*.

the view that the corporation also received a benefit as a result of the modification, namely the continued services of the optionees. There was at least a year between the time the replacement options were granted on January 22, 1975, and the time that these options, or installments thereof, could be exercised. The timing thus guaranteed that Sears would receive additional services from the optionees.[10] It is true that the original grants of options, at higher prices, provided that they could be exercised in installments. The regranted options reset the schedule for exercising options, and extended the time for exercise. To exercise all of the replacement options, the employee had to work for a longer period of time than under the original grants. Consequently, the regrants of options were supported by consideration and the business judgment of the Board of Directors will not be disturbed at least as to the nondirector optionees.

An important exception to the business judgment rule affects the regrant of options to the employee-directors. Delaware courts have interpreted 8 Del.C. § 157, which contains a variant of the business judgment rule, to mean independent business judgment. If the board of directors is interested in the disbursement of corporate assets, the court will review the terms to decide independently whether the consideration is adequate, despite the statute deferring to the business judgment of directors. The Delaware courts engage in this review even when a majority of the shareholders ratify the action of the board. *Ash v. Brunswick Corp.*, 405 F.Supp. 234, 242 (D.Del.1975) (applying Delaware law); *Beard v. Elster, supra; Gottleib v. Heyden*

*Corp.*, 33 Del.Ch. 82, 90 A.2d 57 (Del.1972).[11] Since New York courts have followed the *Gottleib* decision, we think that they would question the adequacy of consideration of the option plan modification if members of the Board were interested. The decisions upholding stock options in *Amdur, supra,* and *Israel, supra,* are consistent with this view because there the board members were not optionees.

Defendants argue that the option plans were administered by the disinterested directors who comprised the Salary and Supplemental Compensation Committee. Plaintiff concedes that the members of this Committee were not potential or actual recipients of options under the plans, but contends that the Committee abdicated its function to the management of Sears, including the very officer-directors who were recipients of the options. In particular, plaintiff points to the fact that the Committee always accepted the recommendations of management concerning the selection of optionees and the number of options to be granted.

Plaintiff's argument, however, misses a critical, undisputed fact. Management only made recommendations for stock option grants to the approximately 15,000 key employees who were not also officers and directors. The members of the Committee lacked personal knowledge of the abilities and potentials of these key employees. The Committee, however, was keenly familiar with the experience and ability of the twelve directors who received options as employees. Since these directors periodically reported to the full Board, the Committee members had personal knowledge of

---

**10.** Two employees near mandatory retirement, out of 15,727 employees, received replacement options that could be exercised about six months after the date of grant. Even these two employees had to contribute some services in order to exercise their options. Moreover, one court has noted that a stock option grant to an employee on the eve of retirement is valid because it serves as an example to other employees that they will be treated generously when they grow older. *Freedman v. Barrow*, 427 F.Supp. 1129, 1156 (S.D.N.Y.1976). *But cf.*

*Goldsholl v. Shapiro*, 417 F.Supp. 1291, 1299 (S.D.N.Y. 1976).

**11.** Section 713 of the Business Corporation Law, which provides that interested director transactions are not void if certain substantive or procedural requirements are met, does not preclude this interpretation of the business judgment rule. *See* Part II of this opinion, *supra.* Even if the transaction is valid under § 713, the interested directors may be liable for waste. *Rapoport, supra,* at 646.

these directors' history with Sears, their performance, and their responsibilities. Aff. of W. Wallace Tudor, ¶ 4. In addition, Gordon Metcalf, a member of the Committee when the cancellations and regrants of 1973 through 1975 were made, and a former Chairman of the Board, filed an affidavit indicating that he had sufficient personal knowledge of the employee-directors to make recommendations. Plaintiff has not disputed these facts. Therefore, though the independence of the Committee with respect to nondirector key employees may be questionable, there is no factual dispute that the Committee acted independently in awarding options to the twelve directors. Therefore, the Committee's judgment is conclusive under the business judgment rule.

Even if there were a question of fact concerning the Committee's independence, we would have great difficulty in allowing the claim of waste to proceed to trial. None of the replacement options issued in 1974 to directors was exercised, so the first cancellation and regrant could not have wasted the assets of Sears. Significantly, when replacement options were issued for the second time in 1975, the employee-directors received options for only 75% of the shares they previously held. In contrast, other employees received the full number of replacement options. The directors were treated less generously than were other employees, and it is difficult to conceive of their action as a gift of corporate assets.

## V. Federal Securities Law Violations

Defendants next contend that their conduct did not violate any of the securities laws and they are entitled to summary judgment on that portion of the complaint. Plaintiff first charges them with noncompliance with § 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n(a).[12] In pertinent part, § 14(a) bars any person from soliciting any proxy in respect of any security registered under the Act in contra-

vention of rules of the Securities and Exchange Commission. From our reading of the papers, we infer that plaintiff relies on Rule 14a–9(a), 17 C.F.R. § 240.14a–9(a), which provides:

§ 240.14a–9 *False or misleading statements*

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

The purpose of § 14(a) is to prevent management from obtaining shareholder authorization for corporate activities by means of deceptive or insufficient disclosures in proxy statements. *J. I. Case Co. v. Borak*, 377 U.S. 426, 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Compliance with § 14(a) will assist shareholders to vote with knowledge of the true nature of the questions under consideration. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 381, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). The broad remedial purpose guarantees that the shareholders have sufficient information to make an informed choice when corporate matters are put to them for decision. *TSC Industries v. Northway*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). In other words, a proxy statement is not sufficient if it "avoid[s] blatant fraud and still keep[s] the shareholder from discovering which shell the pea is under." *Gould v. American Hawaiian Steamship Co.*, 319 F.Supp. 795, 810 (D.Del.1970).

12. Although the complaint also mentions § 10(b) of the Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, plaintiff has made no argument concerning this cause of action and we conclude that he has abandoned it.

There are a number of ways to negate a truth-in-proxy complaint. Without attempting a complete list, certain methods should be mentioned. First, defendants may cure the defect and moot the action by issuing a new proxy statement. Several courts have allowed tender offerors to issue revised offers curing violations of the Williams Act, 15 U.S.C. § 78n(e). *Missouri Portland Cement Co. v. H. K. Porter Co.*, 535 F.2d 388, 396 (8th Cir. 1976); *Ronson Corp. v. Liquifin Aktiengesellschaft*, 497 F.2d 394 (3d Cir. 1974). There is no reason to prevent a similar cure of defective proxy statement.

Alternatively, defendants may choose to stand by the original proxy statement. They can try to show that the statement or omission was not material. In other words, there is no violation without "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, supra*, 426 U.S. at 449, 96 S.Ct. at 2133. A statement may be immaterial in two ways. First, though relevant to the question to be voted on, it can be insignificant or trivial. If Rule 14a–9 demanded that relevant though unimportant information be disclosed to the shareholders, they would be inundated with a mass of indigestible data, unable to pick out the nuggets of useful information. *E. g., Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281 (2d Cir. 1973); *Freedman v. Barrow, supra* at 1141. Second, though the information may be significant, it may be only tangentially related to the question before the shareholders, and therefore unnecessary. *E. g., Rosen v. Drisler*, 421 F.Supp. 1282 (S.D.N.Y.1976); *Garwin v. Cox*, CCH Fed.Sec.L.Rep. ¶ 94,-193 (S.D.N.Y.1973).

Another way to negate an asserted proxy violation is to show that the statement is not misleading or that the omitted matter is not true. *E. g., Shapiro v. Belmont*, 438 F.Supp. 284, 290 (E.D.Pa.1977). A showing that the truth of the omitted matter is in dispute or compromises a legal theory rather than a factual statement may be enough. *E. g., Ash v. LFE Corp.*, 525 F.2d 215, 220 (3d Cir. 1975). Still another method is applicable to omitted statements. Rule 14a–9 states that an omission of material fact violates the Act if that fact "is necessary in order to make the statements therein not false or misleading." In other words, even if the omission is material, there is no violation of § 14(a) unless the proxy statement is made false or misleading as a result. *E. g., Shapiro, supra*, at 290; *Ash v. Brunswick, supra*, at 245. With these principles in mind, we can review the specific alleged violations and the arguments for summary judgment on the proxy issues.

### A. The 1967 and 1972 Proxy Statements

Plaintiff's first attack is on the proxy statements of 1967 and 1972, which were distributed for the purpose of securing shareholder approval for the 1967 and 1972 stock option plans. Plaintiff alleges that two provisions in each proxy statement were made misleading due to the omission of other statements. The two statements were 1) that the option price would be the fair market value on the date the option was granted and 2) that only the shareholders could amend the plan. Plaintiff asserts that the shareholders could not have determined from these statements that the directors intended to retain the power to do the following acts without shareholder approval: 1) lower the option prices by cancelling and regranting options; 2) extend the time for exercising options from five years to ten years; 3) issue a total of more options than were authorized by the plans, counting both cancelled and regranted options. Once again, plaintiff stresses that in 1962, Sears' option plan permitted the Board to lower the option prices without shareholder approval if the market value of Sears stock declined. Because this power was not expressly reserved in the 1967 and 1972 plans, plaintiff argues that the shareholders were led to believe that these plans were meant to benefit the optionee only if the market price of Sears rose.

Defendants attempt to debunk this theory. They point out that the price reduc-

tions were interpretations rather than amendments of the plans and that the proxy statements did disclose that the Board retained the power to issue interpretations consistent with plan provisions. Though they might have breached the plan by lowering the prices by fiat, defendants declare that they merely offered the optionees a chance to cancel their options, and the optionees chose to do so. The director defendants stated in affidavits that before the 1967 and 1972 plans were adopted, they did not discuss what to do if the market value of the shares dipped below the option price, and that any statements in the 1962 proxy statement about the Board's power to change the option price were motivated by favorable tax treatment of stock options, which was eliminated in the Internal Revenue Code of 1964.

■ We are not entirely persuaded by these arguments. Despite the rationalization that the price adjustment clause in the 1962 plan was based solely on tax considerations, all stock option plans are framed in view of corporate and securities law implications as well as tax considerations. In addition, the question of the directors' intent or state of mind when they adopted the 1967 and 1972 plans is particularly inappropriate for resolution on a motion for summary judgment, even though they "concede" that they did not discuss the possibility of a market decline. We could not grant summary judgment for defendants holding that the omissions were not materially misleading because materiality turns on the unresolved inferences to be drawn from the omissions. *TSC v. Northway, supra,* at 450; *Tankersley v. Albright,* 514 F.2d 956, 963 n. 11 (7th Cir. 1975).

■ But even if the omissions in the 1967 and 1972 proxy statements were materially misleading, we do not think that the defect is actionable now in light of subsequent events. As discussed in Part II of this opinion, we have determined that the

1976 ratification provided the needed shareholder authorization for the directors' actions. No challenge to the ratification proxy statement has been made under § 14(a). This statement described the cancellations and regrants in detail and included copies of the 1967 and 1972 stock option plans. In the 1976 statement, the Board of Directors stated that they believed their actions were consistent with and authorized by the plans. Even if the 1967 and 1972 proxy statements left the impression that the optionees would reap their reward only if their efforts improved the value of Sears' stock, the 1976 proxy statement stated the true position of management.

Plaintiff's argument that ratification cannot cure violations of the federal securities laws is based upon cases brought under the antitrust laws, *Rogers v. American Can Company,* 305 F.2d 297 (3d Cir. 1962); *Gottesman v. General Motors Corp.,* 268 F.2d 194 (2d Cir. 1959), rather than under disclosure provisions such as § 14(a). More significantly, it is not the shareholder vote which cured any disclosure violations, but rather the more complete disclosures made in the 1976 statements.[13]

■ Plaintiff incorrectly asserts that § 29(b) of the Securities and Exchange Act, 15 U.S.C. § 78cc, which states that contracts in violation of this chapter are void, renders the options cancellations a nullity, incapable of ratification. Assuming that the 1967 and 1972 proxy statements did violate § 14(a), the Supreme Court has rejected this extreme interpretation of the effect of § 29(b) in *Mills v. Electric Auto-Lite Co., supra,* at 387.

In short, we hold that the 1976 proxy statement cured any violations of § 14(a) in the 1967 and 1972 proxy statements, and that plaintiff's attack upon them is moot.

### B. The 1974, 1975, and 1976 Proxy Statements

Next, plaintiff attacks the proxy statements distributed to shareholders in connec-

---

13. Were the argument made that a proxy violation could not be cured after the shareholder vote was taken, we would reject it considering the facts of this case. The shareholder vote of 1976 provided the necessary authorization for the modifications of option prices. *See* Part II of this opinion, *infra.*

tion with the annual meetings of 1974, 1975, and 1976, at which the individual defendants were elected directors. To summarize eight detailed pages of allegations in the complaint, plaintiff contends that the proxy statements of 1974, 1975, and 1976, sent to the shareholders for the purpose of electing directors, were misleading because they failed to inform the shareholders of salient facts concerning the cancellation and regrant of options to the directors for election. Had this information been included, plaintiff charges, the shareholders would have known that the directors violated the 1967 and 1972 plans for the primary purpose of increasing their own compensation. Apparently, plaintiff's position is that the shareholders would have had reason to suspect the directors' integrity and that the omitted information would have influenced their voting decision.

We have reviewed all of the proxy statements, evaluated the disclosures that were omitted, and conclude that there are no disputes of material fact. Defendants are entitled to summary judgment as a matter of law holding that there are no proxy violations in the 1974, 1975, and 1976 statements. Before turning to the reasons for this conclusion, it is necessary to address two arguments raised by the defendants concerning the sufficiency of the three proxy statements.

 In their first memorandum, defendants state that the three proxy statements were sufficient because they complied with and even exceeded the requirements established by the SEC. Schedule 14A, 17 C.F.R. § 240.14a–101 (1977), lists information that must be included in proxy statements. Item 7 in Schedule 14A details information that must be given concerning remuneration of management. Item 7 is applicable to proxy statements issued for the purpose of electing directors as well as proxy statements seeking shareholder approval of stock option plans. Assuming without deciding that the proxy statements conformed to Schedule 14A, it does not follow that the proxy statements were adequate under Rule 14a–9. The items enumerated in Schedule 14A establish a minimum level of disclosure, but Rule 14a–9 does not indicate that they are exclusive or exhaustive. Noncompliance with the items may be convincing evidence of a proxy violation, *Dillon v. Berg*, 326 F.Supp. 1214, 1229 (D.Del. 1971), aff'd, 453 F.2d 876 (3d Cir. 1971), but the standard set by the statute is full and fair disclosure, which may be higher than compliance with Schedule 14A. *Lyman v. Standard Brands, Inc.*, 364 F.Supp. 794, 796 (E.D.Pa.1973).

 The second preliminary contention of the defendants is that since the purpose of the meetings held in 1974, 1975, and 1976 was to elect directors, their failure to disclose certain information about the stock option plans was irrelevant. *See Rosen v. Drisler*, 421 F.Supp. 1282 (S.D.N.Y.1976). Although tangential information need not be disclosed, the shareholders have an interest in knowing what compensation the directors received. In addition, they should not be precluded from learning facts impugning the honesty, loyalty or competency of directors, such as the existence of litigation against them, or self-dealing by them. *E. g., Kass v. Arden-Mayfair, Inc.*, 431 F.Supp. 1037, 1044 (C.D.Cal.1977); *Beatty v. Bright*, 318 F.Supp. 169, 173 (D.Ia.1970). The relevant inquiry is whether the omitted information was material and true, and whether it tended to make the proxy statement misleading.

 Before discussing plaintiff's contentions concerning the omissions in the three proxy statements, we shall review the information which was disclosed in the proxy statements. The proxy statements for 1974, 1975, and 1976 were accompanied by annual reports, pursuant to Proxy Rule 3(b), 17 C.F.R. § 240.14a–3(b) (1977). In evaluating the sufficiency of proxy statements issued for the purpose of electing directors, we may consider the financial information included in the annual report. *Freedman v. Barrow, supra*, at 1142 n. 4; *compare Ash v. LFE*, 525 F.2d 215 (3d Cir. 1975).

The 1974 proxy statement listed the names of the twelve director-employees

seeking election who were granted stock options from February, 1973 through February, 1974. It listed the number of options granted each director during that time, the average option price per share, $85.94, and the total number of options that each director held on February 28, 1974. The statement noted that nearly all of the options granted to directors were issued on January 22, 1974, and replaced qualified and nonqualified options granted in December, 1972 at a higher exercise price. It added that the replacement options expire on January 12, 1984.

The annual report for 1973, which accompanied the 1974 proxy statement, filled in some of the background of the stock option programs. It stated that

Options under the Company's plans are granted at the fair market value on the date of the grant. Generally options become exercisable in four annual and cumulative installments beginning one year after the date of grant and expire ten years after the date of grant.

In January, 1974, options for 2,441,910 shares, at a price of $101.13 to $116.44 per share were cancelled at the election of the optionees.

For the year ended January 31, 1974, options for 2,628,974 shares were granted to 16,635 employees at $85.94 to $101.13 per share.

A summary of the option shares outstanding is:

| (thousands of shares) | Year Ended 1974 | January 31 1973 |
|---|---|---|
| Beginning balance | 3,076 | 1,773 |
| Granted | 2,629 | 2,496 |
| Exercised | (5) | (1,178) |
| Cancelled | (2,489) | (15) |
| Balance, January 31 | 3,211 | 3,076 |

In short, the observant shareholder could determine from reading the proxy statement and the annual report carefully that many directors and other employees who were granted stock options before 1974 cancelled the options and received new options with a lower exercise price.

The disclosures in the 1975 proxy statement and the 1974 annual report with it are similar to those made the previous year. The 1975 statement noted that nearly all of the options held by directors, at prices ranging from $85.94 to $89.92 per share, were cancelled by the directors and replaced by new options at a price of $52.29 per share. The replacement options, granted on January 22, 1975, were in an amount equal to 75% of the cancelled options. The proxy statement also indicated that many of the options cancelled that year, in turn, replaced options at an exercise price of $116.44 per share. The 1974 annual report gave additional information about the stock option transactions that occurred that year:

In October, 1974, options for 3,077,288 shares, at a price range of $85.94 to $89.92 per share, were cancelled at the election of the optionees.

On January 22, 1975, options for 3,489,070 shares were granted to 15,727 employees at $52.19 per share.

A summary of option shares outstanding is:

| (thousands of shares) | Year Ended 1975 | January 31 1974 |
|---|---|---|
| Beginning balance | 3,211 | 3,076 |
| Cancelled | (3,147) | (2,489) |
| Granted | 3,489 | 2,629 |
| Exercised | — | (5) |
| Ending balance | 3,553 | 3,211 |

From this information, it was evident that many employee stock options had been cancelled and regranted twice, resulting in options at a price far below the exercise price of the options originally granted.

The first 1976 proxy statement, which was distributed for electing officers rather than for ratification of management's interpretation of the stock option cancellations, contained a table listing the stock option holdings of the same twelve director-employees seeking re-election. No options were cancelled and then regranted that year, and the proxy statement did not mention the cancellations and regrants of options in 1974 and 1975. The annual report for 1975, which was distributed with the first 1976 proxy statement, contained the following summary:

| (thousands of shares) | Year Ended 1976 | January 31 1975 |
|---|---|---|
| Beginning balance | 3,553 | 3,211 |
| Cancelled | (207) | (3,147) |
| Granted | 140 | 3,489 |
| Exercised | (8) | |
| Ending Balance | 3,478 | 3,553 |

Despite these disclosures, plaintiff contends that the proxy statements were misleading because they failed to disclose certain information. This contention is without merit.

First, plaintiff argues that the proxy statement failed to disclose that the Board of Directors caused to be cancelled options, granted under the 1967 and 1972 plans, to purchase 2,441,910 shares at prices ranging from $101.13 to $116.44 per share and caused to be granted in their place new options to purchase stock at $85.94 per share. Complaint, ¶ 64(a). Contrary to plaintiff's contention, this information was plainly disclosed in the 1973 annual report and the report correctly stated that the optionees elected to cancel the options.

Plaintiff makes a similar allegation about the 1975 and 1976 proxy statements. See Complaint ¶¶ 70(a) and 76(a). Since the 1974 annual report, accompanying the 1975 proxy statement contained a similar disclosure, plaintiff's contention about the 1975 proxy statement is also rejected. The disclosures in the 1976 proxy statement are discussed *infra*.

Second, plaintiff alleges that in January, 1974 there were insufficient options available to permit the grant of options to purchase 2,628,974 shares of Sears stock. Complaint, ¶ 64(b). This allegation reflects plaintiff's theory that the cancellation of options was a violation of the plans and therefore void. If the cancellation was valid, and the cancelled options were therefore properly re-optioned, there were never more options granted than authorized at any given time. Aff. of Clayton Banzhaf, Ex. A. Plaintiff's statement would only be true if plaintiff's legal interpretation of the plans were correct, and defendants sharply assert that plaintiff's legal interpretation of the plans is incorrect. It is not a violation of § 14a to fail to disclose a legal theory rejected by those soliciting votes. *Ash v. LFE, supra; Freedman v. Barrow, supra; Waltzer v. Billera,* CCH Fed.Sec.L.Rep. ¶ 94,011 (S.D.N.Y.1973).

Several omissions enumerated elsewhere in the complaint also depend upon plaintiff's legal interpretation of the effect of the cancellations, and therefore disclosure of them was unnecessary. These allegations are as follows. First, plaintiff states that the 1974 proxy statement failed to state that by January 31, 1974, director-employees had been granted 390,000 options in violation of the provision in the 1972 plan specifically limiting the grant of options to director-employees to 300,000 options. Complaint, ¶ 64(c). Second, plaintiff alleges that the 1975 proxy statement failed to disclose that as of February 1, 1974, all of the options available for grant under the 1967 and 1972 plans had already been granted. Complaint, ¶ 70(b). Finally, plaintiff alleges that the 1975 proxy statement failed to disclose that on January 22, 1975, director-employees had been granted 600,000 options in violation of the terms of the 1972 plan that only 300,000 options could be granted to director-employees. Complaint, ¶ 70(e).

Next, plaintiff contends that the proxy statements should have disclosed the terms of the stock options plans, or at least relevant excerpts of the plans. Plaintiff notes that the proxy statements failed to contain copies of the plans or even summaries of the plans. Complaint, ¶¶ 64(d), 70(g), and 76(f). Plaintiff repetitively alleges that the proxy statements failed to set forth the statements in the plans reserving to the shareholders the right to amend the plans. Complaint, ¶¶ 64(f), 70(i), and 76(g). Finally, plaintiff alleges that the proxy statements failed to recite the plan provisions that the option price would be the market value on the original date the option was granted. Complaint, ¶¶ 64(g), 70(j), and 76(h). Plaintiff contends that these omissions rendered the proxy statements misleading because the shareholders could not determine that the board of directors violated the plans at great profit to themselves.

320

The annual reports for the years in question, however, did disclose that stock options are granted at the fair market value on the date of the grant. This language is entirely consistent with the text of both plans, since the plans said nothing about the "original" date an option was granted. Plaintiff's allegation that the shareholders were not informed of the text of the plans or summaries thereof, though, is correct.

■ We do not think that this allegation survives defendants' motion for summary judgment. First, the proxy statements for 1974 and 1975, the years when options were cancelled and regranted, do plainly disclose that the twelve employee directors reaped a large benefit as a result of the transactions. Second, the annual reports show that options of many other employees were cancelled and regranted at the same prices as the directors' options. Therefore, failure to disclose the text of the stock option plans did not conceal the benefit of the transactions to the directors and other employees. Second, it is not at all clear that disclosure of the plans would have enabled the shareholders to conclude that the directors had violated or amended the plans and were arguably unfit for re-election as a result. Defendants staunchly maintain that what they did is consistent with the plans, and the entire issue is basically a matter of interpretation. It is true that had the plans been disclosed, the shareholders could have decided the matter for themselves. But since the proper interpretation of the plans is in dispute, we cannot say that disclosure of the plans would tend to censure the competency or loyalty of the directors. Furthermore, disclosure of the plans was peripheral to the purpose of the proxy solicitation and could have had the tendency to mislead or confuse the shareholders.

Fourth, plaintiff alleges that the 1974 proxy statement should have disclosed that stock options were cancelled for the sole purpose of giving the option holder the right to lower their option price. Complaint, ¶ 64(e). Plaintiff repeats this allegation with respect to the 1975 and 1976 proxy statements. Complaint, ¶¶ 70(h); 76(e). This statement was unnecessary since the proxy statements and annual reports, considered together, clearly show that options at high exercise prices were replaced by options at lower exercise prices. Obviously, each option holder was benefitted.

Fifth, plaintiff attacks the 1975 and first 1976 proxy statement on the grounds that the statements failed to disclose there had been two cancellations of options within a twelve month period which reduced the aggregate exercise price of options granted to all optionees under the plans so that the optionees could exercise options to purchase a total of approximately 3,500,000 shares at an aggregate price substantially below the price at which the prior options could have been granted. Complaint, ¶¶ 70(c); 76(d). This allegation simply reflects an incomplete reading of the proxy statements and annual reports, because substantially all this information was disclosed for 1975. Not all of it was necessary in 1976, since the cancellations and regrants occurred in previous years.

Finally, plaintiff attacks the 1975 and 1976 proxy statements for failure to give certain information concerning the savings accruing to directors and to directors and officers together resulting from the cancellations. Specifically, plaintiff alleges that each proxy statement failed to inform the shareholders that the primary beneficiaries of the two cancellations were the directors and officers who would be able to purchase a total of 465,450 shares at an aggregate price more than $20,000,000 below the price at which the prior options could have been exercised. Complaint, ¶¶ 70(d); 76(b). Additionally, plaintiff alleges, the proxy statements failed to state that as a result of the cancellations, 12 of the 23 directors seeking re-election would be able to purchase 224,-250 shares at an aggregate price of more than $10,000,000 below the aggregate price at which the predecessor options could have been exercised. Complaint, ¶¶ 70(f); 76(c). Once again, this information was disclosed right on the proxy statements. The share-

holders could see from the tabulation of share options exactly how many options each director held. The officers and directors as a group held a total of 465,450 shares, and the directors alone held a total of 224,250 shares. The shareholders could easily calculate the total savings to each group resulting from the cancellations by multiplying the difference between the old option price and the new option price by the total number of shares held by each group of Sears employees.

Furthermore, since no options were cancelled and then regranted in 1976, the 1976 proxy statement was properly less detailed than were the 1974 and 1975 proxy statements.

Therefore, we conclude on the merits that none of the omissions cited by the plaintiff were material or made the proxy statements that were issued misleading. But even if they were, or even if summary judgment on the issue is inappropriate, the entire issue of the sufficiency of the 1974, 1975, and 1976 proxy statements for the election of directors is now moot.

Directors of Sears are elected for one year terms. Elections were held in 1974, 1975, and 1976. The directors elected in 1976 served until 1977. Now, in 1978, it is impossible to enjoin the past shareholders' meetings, or to bar the directors from holding office for terms now concluded. Plaintiffs do not seek money damages stemming from the election of directors for the years in question, but only wish to obtain a declaratory judgment that the elections of 1974, 1975, and 1976 are null and void. Such a declaration would have no practical impact. This is not a case where defendants have voluntarily abandoned a practice, which they might renew in the absence of judicial intervention. It is not capable of repetition yet evading review. Following the analysis and the holding of *Browning Debenture, Etc. v. Dasa Corp.*, 524 F.2d 811, 814–17 (2d Cir. 1975), these claims are dismissed as moot.

## VI. Defendants' Motion to Strike

Defendants also move to strike the affidavit of Bertram Bronzaft, one of the attorneys for plaintiff, because it is based on inference rather than personal knowledge. Alternatively, defendants contend that specific paragraphs of the affidavit should be stricken for various reasons. Plaintiff does not oppose this motion. According to Fed.R.Civ.P. 56(e), an affidavit opposing a motion for summary judgment shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. An affidavit may be disregarded if it contains conclusions of law or of ultimate fact, *Ashwell & Co. v. Transamerica Ins. Co.*, 407 F.2d 762 (7th Cir. 1969); statements made upon information and belief, *Automatic Radio Mfg. Co. v. Hazeline*, 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312 (1950); or argument, *United States v. Coleman Capital Corp.*, 295 F.Supp. 1016, 1021 (N.D.Ill.1969). If admissible facts and inadmissible statements are mingled in the same affidavit, the court may rely on the facts and disregard the rest. *Wimberly v. Clark Controller Co.*, 364 F.2d 225, 227 (6th Cir. 1966). Affidavits submitted by attorneys for the parties are tested under these standards. 10 Wright and Miller, *Federal Practice and Procedure: Civil*, § 2738, at 699 (1973).

Mr. Bronzaft's affidavit, which contains 152 paragraphs, was filed as a statement of facts in opposition to the motion for summary judgment. In large part, it contains assertions, arguments and inferences derived from defendants' affidavits. Since it does contain some facts which purport to be within affiant's personal knowledge, defendants' motion to strike the entire affidavit is denied. Some paragraphs of the affidavit will be stricken in accord with defendants' objections. Paragraphs 9, 10, 16, 25, 30, 32, 43, 78, 111, 146(d), and 147 are stricken to the extent that they are founded on inference or belief. Paragraphs 38 and 121 are stricken because they do not purport to be based on the personal knowl-

edge of the affiant. Paragraphs 60, 86, 92, 93, 104, 112, 117, 123, and 143 are stricken because they contain argument or statements of ultimate fact. Also stricken on this ground are the second sentence of paragraph 68, the second sentence of paragraph 70, and portions of paragraphs 79, 80, 83, 84, 85, 136, and 152 as indicated in defendants' motion to strike. The motion to strike paragraphs 39, 125, 126, 130, 134, and 149 is denied. In the interest of judicial economy, we shall consider as argument all portions of the affidavit stricken above.

## VII. Summary

To summarize, we hold that defendants are entitled to summary judgment on all claims arising under the federal securities laws. Plaintiff has abandoned his claim under § 10(b) of the Securities and Exchange Act, and the § 14(a) claims are moot. The proxy statement issued on August 30, 1976 cured any § 14(a) violations in the 1967 and 1972 proxy statements. Since all of the directors elected at annual meetings in 1974, 1975, and 1976 have completed their terms of office, the attack on the proxy statements preceding these meetings is moot.

With respect to the state law claims, our ruling is as follows. Plaintiff's first contention is that the cancellations and regrants of options were not properly authorized. Defendants' motion for summary judgment is granted on this issue, because the ratification vote of October 13, 1976 provided the necessary authorization. Plaintiff's second contention is that the cancellations and regrants are void because the directors who adopted the alterations were interested. For the reasons given in Part IV, supra, we hold that defendants are entitled to summary judgment on this issue. Finally, plaintiff contends that the directors wasted the assets of Sears by cancelling and regranting options. We hold, for the reasons given in Part V, supra, that defendants' motion for summary judgment as to the adequacy of consideration is granted concerning options granted to director employees as well as to nondirector-employees.

Accordingly, defendants' motion for summary judgment is granted in its entirety, and judgment will enter dismissing the complaint.